NAKAMOTO, J.
*597 **61 Respondent John Wigle first worked for petitioner Eugene Water and Electric Board (EWEB) as a temporary worker in a series of positions through a temporary-staffing company. EWEB, a public employer, later hired Wigle as a regular employee. When Wigle retired from EWEB, a dispute ensued over when Wigle had become eligible for retirement benefits from the Public Employees Retirement System (PERS). The outcome would affect the amount of Wigle's monthly retirement benefit.
The dispute centers on what the legislature intended in a 1981 statute governing PERS eligibility. That statute provides, in part: "No person may become a member of the system unless he is in the service of a public employer and has completed six months' service * * *." Former ORS 237.011 (1981), renumbered as ORS 238.015(1) (1995) (emphasis added).
In a contested case proceeding, the Public Employees Retirement Board (the board) concluded that, even though he was working through the temporary-staffing company, Wigle was eligible for PERS retirement benefits because he had worked for EWEB for six months. The Court of Appeals affirmed the board's order, rejecting EWEB's contention that Wigle became eligible only upon his later hire as a regular employee. Eugene Water and Electric Board v. PERB , 289 Or. App. 302, 410 P.3d 1026 (2017).
We conclude that the legislature likely intended a person "in the service of a public employer" to mean an employee of the public employer on that employer's payroll-not someone who, in hindsight, was determined to have a common-law employment relationship with the public employer. In this case, EWEB placed Wigle on its payroll when he was hired as a regular employee. Accordingly, we reverse the decision of the Court of Appeals and the board's final order and remand the case to the board.
I. BACKGROUND
A. PERS Overview
In 1953, the legislature enacted a comprehensive statutory scheme establishing a retirement system for public **62 employees in Oregon. In the Public Employes Retirement Act of 1953, the legislature declared:
"A system of retirement and of benefits at retirement or death for employes of public employers hereby is established and shall be known as the Public Employes Retirement System. Any similar system being operated by a public employer at the time this Act takes effect may be integrated into this system as hereinafter provided."
Or. Laws 1953, ch. 200, § 3, codified as former ORS 237.005 (1953). The statute in dispute was enacted as part of the 1953 Act. Or. Laws 1953, ch. 200, § 8.
This court recently provided an overview of PERS that in two respects forms the backdrop for the dispute in this case. First, large numbers of public employers and employee members participate in PERS:
"Employees become PERS members after working six months in a qualified position for the state or other participating public employer. ORS 238.015(1) ; ORS 238A.100(1) ; ORS 238A.300(1). There are more than 330,000 members in the PERS system, including current employees (active members), unretired former employees (inactive members), and retired former employees (retired members). And there are about 900 participating public employers, including all state departments and agencies, all school districts, and nearly all units of local government."
Moro v. State of Oregon , 357 Or. 167, 175, 351 P.3d 1 (2015) (footnote omitted).
And second, PERS retirement benefits are funded through a combination of employee and employer contributions and investments of those contributions over time. The board "administers PERS and serves as trustee of the Public Employee Retirement Fund (the fund), which the board uses to pay member retirement benefits." Id. In carrying out its responsibility to ensure that the fund has enough assets to pay retirement benefits to *598 PERS members, the board "relies on three sources to generate the fund's assets: member contributions; employer contributions; and investment income." Id.
In overview, to "generate sufficient assets from those three sources to equal the retirement benefits owed to PERS
**63 members[,]" the board "attempts to prefund each member's benefits by collecting contributions both from that member and from his or her employer while the member is working" and then "invests those contributions over the course of the member's career and collects the income from those investments." Id. More specifically, the board "first determines the value of projected benefits for each member and then attempts to set current contribution rates so that, when invested, those contributions will grow and fully fund the benefits that the member will receive in retirement." Id. at 176-77, 351 P.3d 1. "Member contribution rates are set by statute at 6% of the member's salary." Id. at 177, 351 P.3d 1. "Usually, employers pay for that contribution on behalf of their employees." Id. at 177 n. 4, 351 P.3d 1. The board "may adjust only the employer contribution rates[,]" and the board "sets employer contribution rates every biennium." Id. at 177, 351 P.3d 1. To set the employer contribution rates for PERS members like Wigle, the board "makes actuarial projections involving a member's career path, future earnings, and life expectancy, as well as anticipated earnings on investments." Id. at 179, 351 P.3d 1.
B. Facts
We take the facts, which are undisputed, from the record and the board's final order. See ORS 183.482(7) ("Review of a contested case shall be confined to the record, and the court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion.").
Wigle worked in three temporary positions at EWEB. The first lasted only a few months. The second, which is central to the dispute, lasted almost one year. On November 1, 1982, Wigle started performing work as a residential analyst/inspector. EWEB placed Wigle in a "temporary/contract position" through Kelly Services, a temporary-staffing company, after EWEB employees had interviewed and selected him. After working elsewhere, Wigle returned to EWEB for a third time, and, as before, worked less than one year in a temporary/contract position through Kelly Services. EWEB received federal funding for Wigle's temporary/contract positions, which were part of a program to provide residential customers with energy audits, through contracts with the Bonneville Power Administration (BPA).
**64 For any given year of funding, BPA did not provide EWEB with a confirmed annual budget until approximately one month before the year started.
While Wigle worked for EWEB in a temporary/contract position, he reported to work at EWEB, without having to check in with Kelly Services. EWEB provided Wigle with everything needed for work: a desk, a badge and EWEB business cards identifying him as an employee, materials to use for inspections and audits, work overalls, and an EWEB fleet vehicle to drive to and from assignments. Wigle's duties were similar to those of EWEB's regular full-time employees, and he used EWEB-created protocols to conduct home inspections and analyses. He also was subject to performance reviews every six months by his supervisors at EWEB.
At the end of each week, Wigle completed a Kelly Services time card, which he submitted to his supervisor at EWEB, who would sign on a line calling for the "customer's signature" and forward the time card to Kelly Services. Pursuant to EWEB's contract with Kelly Services, EWEB paid Kelly Services fees for temporary workers like Wigle. Kelly Services-not EWEB-issued paychecks to Wigle when he worked at EWEB in temporary/contract positions.
EWEB concedes that it "exercised sufficient control over the hiring and working conditions of Wigle" in his temporary/contract positions so that he and EWEB were in a common-law employee-employer relationship rather than an "independent contractor arrangement." Yet while Wigle worked in a temporary/contract position, he did not accrue paid sick days or vacation time and did not receive other employment benefits, such as health or life insurance. Nor did Wigle or *599 EWEB make PERS contributions on Wigle's behalf.
Wigle knew that he was not receiving employment benefits in the temporary/contract positions, and he applied for and was hired in a regular full-time position with EWEB, effective February 1, 1986. As of that date, he began to accrue paid sick days, vacation time, and insurance benefits. Six months later, he was recognized as a PERS member, effective August 1, 1986. EWEB then began making **65 contributions to PERS on his behalf. Wigle continued his employment with EWEB until he retired as of November 1, 2011.
At the end of Wigle's career with EWEB, EWEB vacillated over how to treat the PERS eligibility dates for its various employees who had worked at EWEB through a temporary-staffing company before being hired into a regular position. In 2010, EWEB sought legal advice, and EWEB's legal counsel determined that, for purposes of PERS eligibility, PERS likely would consider those individuals to have been employees, even when they worked as temporary staff. As a result, EWEB notified the affected employees that "PERS may now view your time at the temporary agency as PERS-covered employment."
At EWEB's request, PERS adjusted Wigle's PERS-eligible start date to November 1, 1982. Accordingly, PERS charged EWEB over $ 40,000 to account for the retirement contributions that EWEB should have made, and earnings on those contributions that Wigle would have accrued, had Wigle become a PERS member six months after his adjusted start date. EWEB paid the invoice. In January 2012, after Wigle had retired, PERS notified Wigle that his PERS membership date had been adjusted to May 1, 1983. As a result of those adjustments, Wigle received close to two additional years of creditable service and related contributions and earnings to his PERS account.
But at an unspecified time after EWEB paid the invoice, EWEB received a second-and contrary-legal opinion regarding PERS eligibility for employees like Wigle who had initially worked through a temporary-staffing company. EWEB then backtracked by requesting that PERS again change its records, this time to reflect that Wigle became a PERS-eligible employee on February 1, 1986-his hire date as a regular employee. EWEB explained that Wigle had not been "in the service of a public employer" until then and that Wigle had been paid by a temporary-staffing company earlier.
PERS initially accepted EWEB's second change, and it issued a determination notice to Wigle that his retirement benefit would be reduced by approximately $ 325 per **66 month. When Wigle appealed that determination, however, PERS agreed with Wigle that he was PERS-eligible as of November 1, 1982, the date he began his temporary/contract position. PERS issued an amended determination rejecting EWEB's contention that, by virtue of having been paid through a temporary-staffing company, Wigle was not PERS-eligible until February 1, 1986, and referred the matter to the Office of Administrative Hearings for a contested case hearing before an administrative law judge (ALJ), at which PERS participated as a party.
C. Final Order and Judicial Review
After the hearing, the ALJ issued an opinion in Wigle's favor, which the board affirmed. It concluded in its final order that the phrase "in the service of a public employer" as used in former ORS 237.011 (1981) was "synonymous with employment" with a public employer. The board set aside both PERS's initial and amended determinations and ordered PERS to correct its records to reflect that Wigle "began employment with EWEB on November 1, 1982," and "became entitled to PERS membership as of May 1, 1983."
EWEB sought judicial review of the board's order. EWEB's primary argument to the Court of Appeals was that the board had failed to "properly take into account the PERS statutory scheme." Eugene Water and Electric Board , 289 Or. App. at 307, 410 P.3d 1026. EWEB focused on the way in which PERS contributions were made, including the required employee contribution to the Public Employees Retirement Fund based on six percent of the member's salary and the duties of public employers related to each payroll. Id. , 410 P.3d 1026.
*600 Wigle and the board responded that the phrase "in the service of a public employer" simply referred to performance of work for a public employer and that, if eligibility required the employee to receive a salary from a public employer, that requirement was met because EWEB paid Wigle's salary through Kelly Services and the PERS statutes do not require the salary to be paid directly out of public funds. Id. The board added that a person becomes eligible for PERS membership after six months of work so long as "the person does not fall within any of the exceptions set forth in the PERS statutes." Id.
**67 The Court of Appeals affirmed. Like the board, the court concluded that the legislature had intended "service" to have its common meaning, that is, "working" or "employment." Id. at 309, 410 P.3d 1026. Wigle had performed work for EWEB, and EWEB conceded that Wigle had been an employee under the common-law test differentiating employees from independent contractors. The court then turned to the second sentence of former ORS 237.011 (1981), which provided that "[e]very employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period." 289 Or. App. at 310, 410 P.3d 1026. The court concluded that, although the legislature had carved out some exceptions to the class of PERS-eligible workers, none of them excluded Wigle as an "employe" when he worked for EWEB through Kelly Services. Id. at 311, 410 P.3d 1026.
EWEB petitioned for review. We allowed EWEB's petition to determine whether a common-law employee who works for a public employer through a temporary-staffing company and who is paid by that company is "in the service of a public employer" and eligible for PERS retirement benefits under former ORS 237.011 (1981).
II. ANALYSIS
On review, the board, on one hand, and EWEB, on the other, continue to propose two fundamentally different interpretations of the 1981 statute.[1] The board makes the case that the Court of Appeals' holding was correct. It argues that the legislature intended "in the service of a public employer" to have an ordinary meaning, namely, performance of work for, or employment by, a public employer. And, the board adds, a common-law employment relationship between a worker and the public employer is qualifying employment, even if the worker was not on the public employer's payroll and instead worked in a temporary position, without employment benefits, through a temporary-staffing company.
EWEB acknowledges that the board advances a plausible reading of the statutory text. But EWEB suggests **68 that the phrase "in the service of a public employer" remains ambiguous because the dictionary definitions that the board and the Court of Appeals cite "do not resolve whether a person is a servant of Company A if he receives his wages from Company B." EWEB further argues that the legislature intended "in the service of a public employer" to refer to a particular employment relationship in the context of the PERS statutes: The PERS statutes set out that retirement benefits are based on a PERS member's salary from the public employer, and, given that context, a worker who is "in the service of a public employer" refers to someone (1) who is in an employee-employer relationship with the public employer and (2) who is formally placed on the public employer's payroll.
Our task, therefore, is to construe the statutory phrase "in the service of a public employer." Absent lingering uncertainty regarding the interpretation of the statute, that task typically involves examining the text in context, and considering any pertinent legislative history, to determine legislative intent. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). As we explain, we conclude from the text of former ORS 237.011 (1981), in context, that the legislature most likely intended a PERS-eligible employee to be one who is on the public employer's payroll and *601 not one who could be determined to be in a common-law employment relationship-as opposed to an independent-contractor relationship-with the public employer.[2]
A. Text
We begin the analysis of a statute, as always, with the text. Former ORS 237.011 (1981) provided, in part:
"No person may become a member of the system unless he is in the service of a public employer and has completed six months' service uninterrupted by a total of more than 30 **69 working days during the six months' period. Every employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period."
The first sentence of former ORS 237.011 (1981) remained as originally enacted as part of the 1953 Act. Or. Laws 1953, ch. 200, § 8. That sentence plainly required a person to be "in the service of a public employer" before becoming a member of PERS. The relevant definitional statute, former ORS 237.003 (1981), however, did not define the word "service" or the phrase "in the service of," and neither was such a definition in the original enactment, see Or. Laws 1953, ch. 200, § 2.
When the legislature has not defined a word or a phrase, we may assume, at least initially, that the word or phrase has its ordinary meaning. DCBS v. Muliro , 359 Or. 736, 745-46, 380 P.3d 270 (2016). No one disputes that the ordinary meaning of the phrase "in the service of" points to employment by or work for an employer, based on the ordinary meanings of "service" and, relatedly, "servant." The noun "service" is most relevantly defined as the "occupation, condition, or status of a servant" or "[p]erformance of labor for the benefit of another, or at another's command[.]" Webster's New Int'l Dictionary 2288 (unabridged 2d ed. 1934). A "servant" is defined as "[o]ne who serves, or does services, under obligation and subject to command[.]" Id. at 2287.
However, sometimes undefined terms in a statute are terms of art, with technical meanings used in, for example, a trade, a field of activity, or an area of the law. See Comcast Corp. v. Dept. of Rev ., 356 Or. 282, 296, 337 P.3d 768 (2014) (when legislature uses term of art, court will look to the meaning and usage of those terms in the discipline from which the legislature borrowed them). The word "service" has various legal meanings, depending on context. In 1953, in the context of contracts, the legal meaning of "service," like its ordinary meaning, denoted employment or work. In Black's Law Dictionary 1533 (4th ed. 1951), "service" is defined as "being employed to serve another; duty or labor to be rendered by one person to another, the former being bound to submit his will to the direction and control of the latter" or the "act of serving; the labor performed or the **70 duties required." But the same legal definition also stated that "service" and "employment" are terms that "generally imply that the employer, or person to whom the service is due, both selects and compensates the employee, or person rendering the service." Id.
That legal definition of "service" signals the underlying question at hand: Granting that "service" in former ORS 237.011 (1981) denotes employment or work-whether the word is used in its ordinary sense or in its legal sense-what kind of PERS-qualifying employment or work did the legislature intend in the circumstances of this case? Here, EWEB depended on the availability of federal funding and took steps not to hire Wigle as a regular employee or to put him on its payroll while he was in a temporary/contract position. Nevertheless, Wigle and EWEB were in a common-law employee-employer relationship due to the extent of EWEB's control over Wigle and his work performance. Did the legislature intend, as the board *602 concluded, that a common-law employment relationship was PERS-qualifying, regardless of whether the worker was paid by a temporary-staffing company and received no employee benefits? Or, did the legislature intend a worker to receive PERS benefits only after the worker was on the public employer's payroll? The text "in the service of," standing alone, does not provide a ready answer.
B. Context
In this case, context helps us determine the legislature's intended meaning. Context includes other provisions of the same statute and related statutes in the statutory scheme, PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993), as well as earlier versions of the statute at issue, State v. McNally , 361 Or. 314, 325, 392 P.3d 721 (2017). To determine what the legislature intended by using "in the service of a public employer" as a prerequisite for a worker's eligibility for PERS benefits, we review former ORS 237.011 (1981) in context by viewing the statutory scheme as a whole. See Brown v. SAIF , 361 Or. 241, 254, 391 P.3d 773 (2017) (turning to "the relevant statutes in context to determine the interpretation that best fits the statutory scheme as a whole " (emphasis in original)). Because **71 the statute was originally enacted in 1953, the directly relevant statutory scheme is the 1953 Act. See Health Net, Inc. v. Dept. of Rev. , 362 Or. 700, 739, 415 P.3d 1034 (2018) (Context includes "the statutory framework within which the law was enacted." (Citation and internal quotation marks omitted.)).
1. The second sentence of former ORS 237.011 (1981)
We start the contextual analysis with the second sentence of former ORS 237.011 (1981), which helps to explain what the legislature intended in the disputed first sentence. That second sentence provides: "Every employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period." Plainly, that sentence sets out the precise starting point of PERS membership.
Unlike the first sentence, the second sentence of the 1953 enactment had changed by 1981. Its original version provided: "Membership shall begin at the beginning of the first pay period following the six months' period." Or. Laws 1953, ch. 200, § 8 (emphasis added). That change happened in 1955, when "[m]embership shall begin" became "[e]very employe of a participating employer shall become a member of the system." Or. Laws 1955, ch. 131, § 4.
The parties do not contend, nor do we conclude, that the 1955 amendment adding "employe" to the second sentence is significant for purposes of understanding what "in the service of" means. That is, the 1955 addition of "employe"-even as a statutorily defined term-does not resolve the ultimate issue of whether the legislature intended to provide PERS benefits only for workers who were in a formal employment relationship with the public employer and on its payroll or whether those in a common-law employment relationship with the public employer were included as well. The statutory definition of that term is unhelpful because the definition of "employe" was in part tautological and did not positively describe the attributes of a qualifying employee.[3]
**72 Thus, as originally enacted and as it existed in 1981, the second sentence of former ORS 237.011 defined the beginning of an employee's PERS membership as "the first pay period following the six months' period" of continuous service. What EWEB views as significant is the term "pay period." EWEB explains that the legislature's designation of the first pay period as the starting point of membership is a clue that a PERS-eligible employee is one who is on a public employer's *603 payroll. EWEB argues that the legislature intended the term "pay period" to refer to the public employer's-not a third party's-pay period. EWEB supports its argument by reading former ORS 237.011 (1981) in conjunction with another 1981 PERS statute concerning deductions from payroll: former ORS 237.071(2) (1981), renumbered as ORS 238.200 (1995).
Former ORS 237.071(2) (1981), regarding contributions of employees, required a public employer to deduct the employee's PERS contribution from each payroll:
"(1)(a) Each employe who is a member of the system shall contribute to the fund and there shall be withheld from salary of the employe six percent of that salary .
"* * * * *
"(2) The contributions of each employe as provided in subsection (1) of this section shall be deducted by the employer from each payroll and transmitted by the employer to the board , which shall cause them to be credited to the account of the employe in the fund. Salary shall be considered earned in the month in which it is paid. The date inscribed on the paycheck or warrant shall be considered as the pay date, regardless of when the salary is actually delivered to the employe."
(Emphases added.) As EWEB points out, that procedure-with a public employer withholding the six percent PERS contribution from an employee's salary on each payroll and then transmitting that amount to the board-appears to be based on the premise that an employee member of PERS is on the public employer's payroll.
**73 But PERS correctly observes that, between the time of the original 1953 Act and the 1981 version of ORS 237.071, that statute had been amended multiple times and in significant ways. Thus, PERS asserts, the wording of the 1981 version of ORS 237.071 concerning PERS contributions by employees cannot serve as relevant context for what the Legislative Assembly's intentions were when it enacted ORS 237.011 in 1953. Although we agree with PERS that the 1981 version of ORS 237.071 cannot directly shed light on what the legislature intended in the 1953 Act, in some material respects, the 1981 statute is similar to and consistent with its 1953 version and serves as indirect evidence of the legislature's intentions in 1953. See Halperin v. Pitts , 352 Or. 482, 490-91, 287 P.3d 1069 (2012) ("[T]his court not infrequently refers to later-enacted statutes for the purpose of demonstrating consistency (or inconsistency) in word usage over time as indirect evidence of what the enacting legislature most likely intended.").
As originally enacted, ORS 237.071 set out objectives for, among other things, the amount of retirement allowance that PERS members (other than police officers and firefighters) were to receive, depending on the member's eligibility to participate in the federal Old Age and Survivors Insurance program, the number of years of PERS membership the member had, and when the member's service occurred. See Or. Laws 1953, ch. 200, § 13. The statute also provided that "[c]ontributions shall be withheld from one-half of such earnings as shown on the payroll of the employer." Or. Laws 1953, ch. 200, § 13(2). Thus, ORS 237.071 as originally enacted provided for PERS contributions to be withheld from certain earnings shown on the payroll of the employer.
Although that provision was stated in the passive voice, another provision established who was making the contributions and who was withholding them: "From each payroll during the period, his employer shall deduct that percentage of half the amount credited to him on the payroll and shall transmit the deduction to the board, which shall cause it to be credited to his account in the fund." Or. Laws 1953, ch. 200, § 13(4). The contributions, therefore, were the employee's PERS contributions, and, just as provided in **74 former ORS 237.071(2) (1981), the 1953 Act provided for payroll withholdings by the public employer.
That description of the 1953 Act's provisions regarding how public employers were to handle employee contributions to the fund leads us to agree with EWEB's reading of "pay period" in the second sentence of the statute that we are construing. The second sentence of former ORS 237.011 (1981)-providing that every employee "shall become a *604 member of the system at the beginning of his first full pay period following the six months' period"-supports the view that a PERS member is an employee on the public employer's payroll. From the date of original enactment in 1953, the PERS statutory scheme established a system by which the public employer transmits payroll deductions to the board for each member's PERS contributions. In contrast, a public employer using a temporary employee through a temporary-staffing company does not have that employee on its payroll and is not in a position to perform withholdings for PERS contributions. Instead, the temporary-staffing company has the employee on its payroll.
2. The word "service" in other parts of the 1953 Act
In analyzing the context for former ORS 237.011 (1981), we also review the use of the same term in other parts of the same statutory scheme, the 1953 Act, for additional indicators of legislative intent. See State v. Cloutier , 351 Or. 68, 99, 261 P.3d 1234 (2011) (Oregon courts "ordinarily assume that the legislature uses terms in related statutes consistently."). The word "service" or its plural appears throughout much of the 1953 Act.[4] Most of those **75 uses are not illuminating for purposes of our analysis, however; that is, they do not aid in understanding whether or not the legislature intended a PERS-eligible employee to be on the public employer's payroll. However, one of the references to "service" in the PERS statutory scheme provides some substantiation that it was the legislature's intention to require an employee of the public employer to be on the public employer's payroll before the worker became PERS-eligible.
In particular, "services" was used in the definition of "salary" in the 1953 Act. See Or. Laws 1953, ch. 200, § 2(4), codified as former ORS 237.004(8) (1953).[5] "Salary" was defined as meaning the following:
"the remuneration paid an employe in cash out of the funds of a public employer in return for his services to the employer , plus the monetary value, as determined by the Public Employes' Retirement Board, of whatever living quarters, board, lodging, fuel, laundry and other advantages the employer furnishes him in return for his services."
Id. (emphasis added). That definition of salary provides, albeit in the passive voice, that the public employer pays an employee a salary in cash out of its funds for the work that the employee provides. A public employer typically determines the amount of the employee's contribution based on the employee's salary, as to which the public employer has knowledge and control. That, in turn, dovetails with the need for the public employer to withhold from payroll (or to pick up) the amount of the member's PERS contributions. In a retirement benefit system in which a public employer is to make and transmit withholdings for PERS contributions from the employee, that mechanism becomes impractical when the employee is paid by a third party and is not on the public employer's payroll. If a third party is paying the employee, then the public employer will not necessarily know or control the employee's salary. The public employer's payroll, therefore, *605 is a significant part of the apparatus needed for the proper amount of PERS contributions to be made-and it easily allows recordkeeping to occur as well. **76 The board argues that the 1953 Act contains a counterexample involving PERS membership for volunteer firefighters that undermines the idea that the use of "service" implies an employment relationship in which an employee is on the public employer's payroll and directly receiving a salary from the public employer. The board argues that a volunteer firefighter in the 1953 Act is someone "who is employed in a position that does not require 600 hours of service per year" or is a firefighter "who is strictly a volunteer; i.e. , one who receives no remuneration." Thus, the board argues, the fact that a volunteer firefighter may become a PERS member without receiving a salary from the public employer demonstrates that "former ORS 237.011(1) cannot be construed to require the payment of any salary by a public employer as a requisite for membership in PERS." The board similarly observes that almost all uses of "service" in the statutory scheme pertain to PERS membership and refer to labor or work performed for a public employer, not to whether the public employer directly paid the employee.[6] But rather than serving as a counterexample, the case of the strictly volunteer firefighter who receives no salary and who is PERS-eligible under the 1953 Act illustrates the importance of payroll in the PERS statutory scheme.
As originally enacted, former ORS 237.011 contained a section describing how a public employer that wished to include its volunteer firefighters as PERS members was to proceed:
"A public employer employing volunteer fire-fighters may apply to the board at any time for them to become members of the system. Upon receiving the application the board shall fix a wage at which, for purposes of this Act only, they shall be considered to be employed and which shall be the basis for computing the amounts of the contributions which they pay into, and of the benefits which they **77 and their beneficiaries receive from, the fund; and if the wage so fixed is satisfactory to the employer, shall include the fire-fighters in the system."
Or. Laws 1953, ch. 200, § 8(8). Thus, for strictly volunteer firefighters, the legislature required the board and the public employer to fix an agreed wage for them-a phantom salary-for purposes of computing amounts of PERS contributions and the amount of PERS benefits that they and their beneficiaries would receive. That phantom salary, set solely for purposes of PERS, would allow the public employer to follow the method of withholding and transmitting the volunteer firefighter's PERS contributions to the board.
3. The funding mechanism for public employee retirement benefits
Our consideration of how PERS benefits are funded also supports our view that the decision by the Court of Appeals that common-law employees paid by third parties are PERS-eligible under former ORS 237.011 (1981) is not what the legislature likely had in mind. Circling back to the beginning, where we provided background on PERS, we noted, first, that hundreds of public employers and hundreds of thousands of employees are covered by PERS and, second, that the adequacy of funding for the PERS benefits owed to public employees depends on employee and employer contributions and the investment of those contributions over time. We also described how the board sets and collects member contributions-a fixed percentage of the member's salary-and attempts to prefund each member's benefits by collecting sufficient contributions from the member's employer and investing both sets *606 of contributions over the course of the member's career.
Including temporary workers paid through a temporary-staffing company as PERS-eligible employees-in this case because decades later it was determined that the initial working relationship between EWEB and Wigle rose to the level of a common-law employment relationship-introduces uncertainty into a funding system that relies on expected contributions to ensure that enough funds are available to pay members' retirement benefits. The biggest and most obvious uncertainty concerns whether or when **78 any particular worker became a member of PERS entitled to receive retirement benefits. Yet the PERS funding mechanism is member-focused and in part is based on certainty about who is a member and what that member's PERS contributions will be.[7]
Although we do not know whether the legislature contemplated how to treat temporary workers paid through temporary-staffing companies for purposes of PERS in 1953, in light of the funding system that the legislature put in place, we doubt that the legislature would have wanted to introduce such uncertainty by using the phrase "in the service of the public employer." In sum, we conclude from the text and context of former ORS 237.011 (1981) that the legislature most likely intended a PERS-eligible employee to be on the public employer's payroll with a known salary for purposes of computing PERS contribution amounts.
The decision of the Court of Appeals is reversed. The order of the Public Employees Retirement Board is reversed, and the case is remanded to the Public Employees Retirement Board.

On review, the board is the primary respondent. Wigle filed a response opposing the petition for review but did not file a brief on the merits.

The parties have not offered legislative history of the Public Employes Retirement Act of 1953 for the court's consideration. The board explains that no useful legislative history of the 1953 Act exists, and EWEB does not disagree. See also Hughes v. State of Oregon , 314 Or. 1, 18, 838 P.2d 1018 (1992) (stating that "little legislative history exists regarding the 1953 Act"). We also are not presented with an argument by the board that its understanding of the statute, as represented by the board's administrative rules or otherwise, is entitled to any deference.

The definition of "employee" in 1955 was the same as originally enacted: "The term 'employe' includes, in addition to employes, public officers, but not persons engaged as independent contractors and not seasonal, emergency or casual workers whose periods of employment with any public employer or public employers do not in any fiscal year total 600 hours." See Or. Laws 1953, ch. 200, § 2(2); Or. Laws 1955, ch. 131, § 3(4). The definition remained self-referential in 1981. See former ORS 237.003(4) (1981). There is no legislative history that might help elucidate the reason for the 1955 amendment.

See Or. Laws 1953, ch. 200, § 2(3), (4), (7); § 4(3), (5) (used with various definitions); § 7 ("civil service"); § 8; 8(1), (3)-(7), (9) (primarily relating to a worker in a separate retirement system becoming a PERS member); § 9(2)(f) (relating to integrating an existing retirement system with PERS); § 10(3) (relating to transmission of PERS funds from State Treasurer); § 12 (relating to periodic actuarial reports); § 13(1), (2), (4) (outlining objectives for approximate amount of retirement benefits for long-term "service"); § 14(1)-(5) (amounts that public employers must transmit to PERS and credits to members for "service"); § 15(1)-(8) (primarily relating to what happens to a PERS account upon worker's separation from "all service" before and after earliest "service retirement age" and when an "employe" ceases to be a member); § 16(1)-(5) (credit for uninterrupted service, including after military or federal government service); § 17(1)-(4), (6)-(8) (early and compulsory retirement ages and reemployment); § 18 (describing "service retirement allowance"); § 19 (election to convert allowance to annuity or for reduced allowance with payment to surviving beneficiary); § 21(1)-(4), (6) (disability retirement for incapacity).

The definition of "salary" in the 1981 PERS statutes remained in material part identical to the 1953 original. See former ORS 237.003(8) (1981).

The board's argument understandably focuses more on whether a public employer must directly pay a salary to an employee and less on the public employer's placement of the employee on its payroll, because EWEB made the former the centerpiece of its argument as to why Wigle was ineligible for PERS membership until his hire as a regular employee. But we are not bound by the parties' arguments concerning the construction of a statute. Engweiler v. Persson/Dept. of Corrections , 354 Or. 549, 559, 316 P.3d 264 (2013) (stating that this court is obliged to reach a correct interpretation of a statute, "whether or not the correct interpretation has even been advanced by the parties").

In light of the numbers of public employers across the state that participate in PERS, it is unsurprising that the record does not reflect how many former temporary workers could be affected by a holding making them potentially PERS-eligible.