Submitted September 24, 2019, affirmed March 31, 2021

OREGON RACING, INC.,
*Petitioner,*

*v.*

OREGON STATE LOTTERY,
*Respondent.*

Oregon State Lottery Agency
A168343

485 P3d 912

Oregon Racing, Inc. (ORI), which operated a card room at the Portland Meadows racetrack, sought a declaratory ruling from the Oregon State Lottery as to whether two of ORI's practices—(1) charging a door fee to all patrons in the area used for poker playing and (2) exchanging players' chips and holding their money during poker games—disqualified ORI from the "social games" exception to statutory prohibitions on unlawful gambling. The Lottery issued a declaratory ruling in which it concluded that the door fee generated "house income" for ORI and the chip exchange made ORI a "house bank," meaning that ORI was not operating a "social game" as defined in ORS 167.117(21), and, thus, in essence, that ORI's operations were unlawful gambling. ORI seeks judicial review of that ruling. *Held*: The ordinary meaning of "house bank" includes a gambling establishment's supply of chips for purchase and use by players in a poker game, and nothing in the text, context, or history of the statute evidenced the legislature's intent to restrict the term to a dealer against whom bets are placed or the sum of money used by the house; accordingly, the Lottery correctly concluded that ORI's practice of exchanging players' money for chips and holding and safeguarding players' money during gameplay meant that ORI was acting as a "house bank" for purposes of ORS 167.117(21). The phrase "house income from the operation of the social game" most plausibly referred to any benefit that the "house" derived not from the mere presence of the social game (such as increased food and beverage sales or attendance) but from the operation of the game itself—including fees for accessing the games; thus, the Lottery correctly concluded that the door fees charged by ORI to enter the area for playing poker were "house income" under ORS 167.117(21).

Affirmed.

William L. Rasmussen and Miller Nash Graham & Dunn LLP filed the briefs for petitioner.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the brief for respondent.

Craig J. Dorsay, Lea Ann Easton, and Dorsay & Easton LLP filed the brief *amicus curiae* for The Confederated Tribes of Siletz Indians.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Powers, Judge.

LAGESEN, P. J.

Affirmed.

## LAGESEN, P. J.

This case involves a dispute between Oregon Racing, Inc. (ORI) and the Oregon State Lottery over the correct interpretation of state gambling laws. ORI, which operated a card room at the Portland Meadows racetrack,[1] sought a declaratory ruling from the Lottery as to whether two of ORI's practices—(1) charging a door fee to all patrons in the area used for poker playing and (2) exchanging players' chips and holding their money during poker games—disqualified ORI from the "social games" exception to statutory prohibitions on unlawful gambling (and, consequently, from obtaining a video-lottery retailer contract). *See* ORS 183.410 (describing the process for obtaining a declaratory ruling from an agency with respect to applicability of statutes or rules the agency enforces). The Lottery then issued a declaratory ruling in which it concluded that the door fee generated "house income" for ORI and the chip exchange made ORI a "house bank," meaning that ORI was not operating a "social game" as defined in ORS 167.117(21), and, thus, in essence, that ORI's operations were unlawful gambling. ORI now seeks judicial review of that ruling. *See* ORS 183.410 (providing for review of declaratory rulings in the same manner as an order in a contested case). Reviewing the Lottery's construction of the terms "house income" and "house bank" for errors of law, *Rhine v. Racing Comm.*, 40 Or App 651, 656, 596 P2d 576 (1979), we affirm.

## BACKGROUND

For purposes of the declaratory ruling, the parties stipulated to the relevant background facts, which we draw from the Lottery's ruling. ORI operated the Portland Meadows racetrack (before it was torn down) and had a retailer contract with the Lottery for video lottery terminals. ORI and other public establishments in Portland with those contracts (collectively, "retailers") also provided space

---

[1] It came to our attention that Portland Meadows racetrack has since closed and the buildings have been razed. The parties have represented ORI is still operating a card room and that the issues decided by the Lottery still present a live controversy. Based on the representations of the parties, we agree and proceed to the merits of their arguments. We state the facts about the Portland Meadows premises and card room in the past tense in recognition of the reality that the track at this point is Portland history.

and coordination for poker games on the premises, among other entertainment and services. The poker games were exclusively among players with no affiliation to the retailers, and the retailers had no stake in and earned no direct income from the play of the games (for example, there was no commission for operating the game, no tournament entry fees, and no per-hand rake from the games). The poker games operated according to rules published by national poker organizations, and the retailers did not set gaming odds.

At ORI's premises, poker games were held in a limited part of the Portland Meadows campus referred to as the Gaming Room. The Gaming Room had poker tables, large-screen monitors that provided information about the poker games, a dedicated bar, dedicated food service, large-screen TVs with an upgraded sports package, and other diversions, including ping pong, video golf, E-games, chess, cribbage, and fantasy sports. ORI charged a $15 door fee to each patron who entered the Gaming Room, and that fee was the same regardless of whether or not a patron played a poker game in the Gaming Room. ORI did not typically charge a door fee for access to other parts of the Portland Meadows campus.[2]

To facilitate the poker games, ORI provided chips to the players. The players exchanged money for the number of chips that they would like to have available for play. ORI secured that money during gameplay and then returned all money to players at the end of each gaming session. The amount of money returned to an individual player depended on the type of game that the player was playing. For some games, one or more of the players who won the most chips received monetary prizes based on the amount of chips that they won, while other players did not receive any money back. For other games, each player received money in proportion to the number of chips that the player won or lost during play. ORI did not earn income or otherwise profit from safeguarding the players' money during gameplay.

---

[2] The exceptions were the Third Floor Turf Club during events and special events that involved a door charge to enter the Portland Meadows building.

ORI and other retailers conducting poker games on their premises had social game licenses from the City of Portland, which had deemed them in compliance with state and local social gaming laws, which are exceptions to Oregon's prohibitions on "unlawful gambling." *See* ORS 167.117(7) (defining "gambling" and listing exceptions, including "(c) social games"); ORS 167.117(24) (defining "unlawful" to mean "not specifically authorized by law"); *see also* ORS 167.122 (defining the crime of second-degree unlawful gambling); ORS 167.127 (defining the crime of first-degree unlawful gambling). A "social game" is defined as

"(a)   A game, other than a lottery, between players in a private home where no house player, house bank or house odds exist and there is no house income from the operation of the social game; and

"(b)   If authorized pursuant to ORS 167.121 [allowing local governments to authorize and regulate social games in businesses, clubs, and public accommodations], a game, other than a lottery, between players *in a private business, private club or place of public accommodation where no house player, house bank or house odds exist and there is no house income from the operation of the social game.*"

ORS 167.117(21) (emphasis added).

Despite ORI's social game license from the city, the Lottery in 2017 issued an order to ORI terminating its video-lottery retailer contract after determining that poker games occurring on the premises did not qualify as "social games" and therefore constituted unlawful gambling. The parties subsequently entered into an agreement whereby the Lottery withdrew that termination order so that the two key compliance issues underlying the order could be addressed through the declaratory ruling process. The petition for a declaratory ruling framed those two issues as follows:

"1.   If ORI charges a door fee for all patrons to enter the 'Gaming Room' of the Portland Meadows campus, does such income constitute 'house income' under ORS 167.117(21), which disqualifies the on-site poker games from the 'social game' exception to state gambling laws ***?

"2.   Does the practice of exchanging players' money for chips and holding and safeguarding players' money during

gameplay mean that ORI is acting as 'house bank' under ORS 167.117(21), which disqualifies the on-site poker games from the 'social game' exception to state gambling laws \*\*\*?"

ORI argued that both questions should be answered in the negative. It contended that, viewed in its proper historical context, the social game exception was intended to prohibit two categories of betting: "banked" games in which the gambling establishment (or "house") participates in the game through a house player, under odds set by the house, and the wins and losses are paid out of or into the house bank; and commission or percentage games, in which the players wager against one another instead of the house, and the house earns income by taking a scaled commission from each pot, known as the "rake" or "rake-off." Viewed in that historical context, ORI argued, the term "house bank" was never intended to include the practice of simply exchanging chips and safeguarding the money during gameplay; moreover, ORI argued, the phrase "house income from the operation of the social game" should be understood to refer to direct income from commission or percentage games, not indirect income from door fees like those ORI was charging.

The Lottery did not view the social game exception the same way, and issued a declaratory ruling answering both questions in the affirmative. As for the first question, it concluded that "the phrase 'operation of the social game' is broad enough to include not only the playing phases of the game, but other activities necessary to ensure that the game is carried out—including securing premises for the game and soliciting players." Thus, "house income from the operation of the social game" includes a door fee where "games operated in the Gaming Room are an incentive to pay the door fee and enter the room." As for the second question, the Lottery concluded that the term "bank" has several ordinary meanings in the context of gambling, but "house bank" is a phrase that "at the very least encompasses a supply of chips, or other similar tokens, that the house keeps, sells, and redeems." The Lottery ruled that ORI, which kept, sold, and redeemed the chips for poker games in the Gaming Room, therefore acted as a house bank, taking its games out of the social game exception.

ORI seeks judicial review of the declaratory ruling, arguing that the Lottery's broad construction of the terms "house income" and "house bank" ignores the history and context of those terms, has resulted in contradictory directives for Portland retailers, given the choices Portland has made in regulating card games, and has undermined the city's regulation of social gaming.

## DISCUSSION

Our task on judicial review is to determine what the legislature intended by using the phrases "house bank" and "house income from the operation of the social game" in ORS 167.117(21)(b). To that end, we consider the text, context, and any relevant legislative history of that statute, resorting, if necessary, to maxims of construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

Although the text and context of ORS 167.117(21) in particular remain our primary concern, a brief history of Oregon's "social game" exception to the gambling laws provides helpful context for our analysis.

In 1971, Oregon revamped its criminal code, including laws concerning gambling. The drafters explained that "[t]he sections on gambling focus on the professional, exploitative kind of conduct and do not prohibit the 'friendly social game.'" Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, Forward, XXII (July 1970).

As initially enacted, the criminal code included a social game exception that was embedded in the definition of "player" in the gambling laws:

"(7) 'Player' means a person who engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity. *A person who gambles at a social game of chance on equal terms with the other participants therein is a person who does not otherwise render material assistance to the establishment, conduct or operation thereof by performing, without fee or remuneration, acts directed toward the*

*arrangement or facilitation of the game, such as inviting persons to play, permitting the use of premises therefor and supplying cards or other equipment used therein.* A person who engages in bookmaking is not a player."

ORS 167.117(7) (1971) (emphasis added).

The drafters explained:

"The underlying purpose of the sections is to get at the professional who exploits the popular urge to gamble. The individual citizen who places a bet is not criminal. This approach to the gambling statutes eliminates the need for a special immunity statute because the 'player' would not violate the law. Neither are friendly social games criminal under the draft and a person does not promote gambling if he merely invites friends in for a game and provides cards or other paraphernalia. This results from the definition of 'player' in § 263(7) which exempts one who 'gambles at a social game of chance on equal terms with other participants' *so long as he does nothing more than to provide without fee or remuneration the use of premises or the necessary equipment.*

"The Michigan revisers neatly state the case for excluding the friendly social game:

"'Private consensual games are generally accepted as socially if not legally proper, and there is no point in preserving the fiction that they are undesirable.' (Michigan Revised Criminal Code at 465)."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 265, 257 (July 1970) (emphasis altered).

In 1973, the legislature revisited and attempted to clarify the scope of the social games exception. Or Laws 1973, ch 788. The legislature retained the definition of "player" (including with regard to social games), but it also expressly excepted "social games" from the definition of gambling. Or Laws 1973, ch 788, § 1. It then separately defined the term "social game" to make explicit that such games could occur not only in a "private home" but also in a "private business, private club, or in a place of public accommodation," and it introduced the term "house":

> "(11) 'Social game' means a game, other than a lottery, between players in a private home or private business, private club or in a place of public accommodation where no house player, house bank or house odds exist and the gross income from the operation of the social game does not exceed 25 percent of the gross income of the private business, private club or public accommodation."

Or Laws 1973, ch 788, § 1. At the same time, the legislature authorized counties and cities to regulate or even prohibit social games. Or Laws 1973, ch 788, § 3 ("Counties and cities may, by ordinance, prohibit, regulate, limit or license the playing or conducting of a social game.").

Much of the parties' dispute about the current version of the statute traces to their disagreement over what the legislature intended to accomplish in 1973 by adding the phrase "house player, house bank or house odds exist and the gross income from the operation of the social game does not exceed 25 percent of the gross income of the private business, private club or public accommodation." Accordingly, we turn to the text, context, and history of that 1973 change.

We start with the meaning of "house," because the word plays a role in both interpretive questions we are called to answer: whether ORI operates a "house bank," and whether the door charge is "house income." It is a word that can have more than one meaning when talking about gambling. *See Eugene Water and Electric Board v. PERB*, 365 Or 59, 69, 442 P3d 596 (2019) (when construing statutes, undefined words are given their ordinary meaning unless there is reason to believe that the word or phrase is a term of art with a technical meaning, such as in a trade, field of activity, or area of the law). *Webster's* defines the term "house," in relevant part, to mean "(1) : the operators of a gambling game : the management of a gambling establishment : < a percentage of each pot goes to the ~ > (2) : a gambling establishment : CASINO." *Webster's Third New Int'l Dictionary* at 1096 (unabridged ed 2002); *see also Webster's* at 932 (defining a "gambling house" as "a place where gambling is carried on or allowed as a business"). In other words, the "house" can refer to the persons operating or managing the gambling operation, the gambling establishment itself, or both.

Contextually, the legislature's use of that term in 1973 (and thereafter) most plausibly encompasses all three—operators, managers, and the gambling establishment. From its inception, one fundamental difference between "social" games and other gambling is the involvement of persons other than the players themselves in the playing or outcome of the game itself. The statutes, as written, give us little reason to think that the legislature meant to exclude from the definition of "house" anyone who would ordinarily be included in that definition, or that it intended for it to be narrow.

But the parties' dispute on this particular point is not so much about the meaning of "house" as it is about the other terms added to the mix. As for the issue of whether ORI runs a "house bank," as mentioned earlier, ORI understands the legislature to have used the terms "house player, house bank or house odds" in ORS 167.117(21) to refer to a specific type of game in gambling parlance, known as a "banked game." According to ORI, it was widely recognized in 1973 that professional gambling enterprises offer two categories of games: (1) "banked" games (sometimes referred to as "banking" games) and (2) "commission" or "percentage" games.

Banked games, ORI explains, are those games in which the gambling enterprise ("house player") plays against the private individual according to odds set by the enterprise ("house odds"). The house has an inherent advantage in setting odds and earns income in the form of winnings, and the winnings and losses are paid into and out of a fund of money (the "house bank"). In commission games or percentage games, by contrast, the house does not participate but instead operates the game for the individual players to wager with each other and earns its income by taking a percentage from each pot, known as the "rake" or "rake-off."

According to ORI, the legislature's 1973 changes are fully explained by the distinction between "banked" and commission or percentage games. It argues that the legislature used terms describing the elements of a "banked game" ("house player," "house bank," and "house odds") and then permitted establishments to operate commission or

percentage games by allowing them a rake—"gross income from the operation of the social game [that] does not exceed 25 percent of the gross income of the private business, private club or public accommodation."

Although ORI's construction of the statute is not an implausible reading, the text, context, and history of the 1973 amendments ultimately do not convince us that the legislature was drawing the clean distinction between "banked" and "percentage" games that ORI contends. Although the term "banked game" may have been a well understood concept, telling is the fact that the legislature did not say "banking game" or "banked game"—terms that it could have used if it had intended to prohibit only those types of games. *See Webster's* at 172 (defining "banking game" as "a gambling game in which bets must be laid against a gambling house, banker, or dealer"). Instead, the legislature used the term "house bank," which can include but is not confined to arrangements involving "banked games." When we talk about gambling, the word "bank" typically refers to

"[1] **b :** GAMBLING HOUSE *** [2] **b :** a person or persons conducting a gambling house or game; *specif* **:** DEALER *** [3] **a** (2) **:** the sum of money in certain gambling games (as chemin de fer) that is deposited or stated by the dealer as a fund from which to pay his losses **b** (1) the whole supply of chips available for purchase and use by players in a game played with chips (as poker)."

*Webster's* at 172. *See also id.* (defining the verb "bank" to include "to act as banker for (as a gambling game)" and the noun "banker" to include, in the gambling context, "the player who keeps, sells, and redeems the supply of chips used in a game," the "person who agrees to cover the bets of all players up to a certain limit established as the bank," and "the dealer (as in blackjack) or a gambling house or its representative against whom all bets must be placed").

Thus, the ordinary meaning of "house bank" would include the gambling establishment's supply of chips for purchase and use by players in a poker game. Even if the legislature in 1973 was primarily concerned with banking games, the text it enacted does not contains words of limitation indicating that "house bank" is restricted to a dealer

against whom bets are placed or the sum of money used by the house.

The legislative history supplied by the parties surrounding the 1973 enactments provides little insight on this particular question, and nothing that convinces us that the legislature intended "house bank" to mean something narrower than its ordinary meaning would suggest. Nor do any of the later amendments to ORS 167.117(21) suggest that the legislature's continued use of the term "house bank" means something narrower than its ordinary meaning in the gambling context—that is, the person or persons conducting a gambling house or game, including the dealer, against whom bets are placed; the sum of money in certain gambling games that is deposited or stated by the dealer as a fund from which to pay his losses; or the supply of chips available for purchase and use by players in a game played with chips.

For that reason, we agree with the Lottery's conclusion that ORI's practice of exchanging players' money for chips and holding and safeguarding players' money during gameplay meant that ORI was acting as a "house bank" under the plain text of ORS 167.117(21). The public policy considerations that ORI identifies—that it is safer for everyone if ORI safeguards the players' money and provides chips for play—are not grounds for disregarding what the plain text expresses, which is that a gambling establishment acts as a "house bank" by exchanging chips for money regardless of whether it takes a "rake."

With that understanding, we proceed to the second interpretive question posed in this case, which is what the legislature intended by its restriction on "house income," which was added to the statute in 1974. The key change at that time was to replace the phrase "the gross income from the operation of the social game does not exceed 25 percent of the gross income of the private business, private club or public accommodation" with the phrase "*no house income* from the operation of the social game."[3] Or Laws 1974, ch 7, § 1 (emphasis added).

---

[3] The changes also broke up the definition:

"'Social game' means: [*a game, other than a lottery, between players in a private home or private business, private club or in a place of public*

The Lottery looks to the ordinary meanings of the terms used by the legislature to understand that provision. "Income" is defined as "a gain or recurrent benefit that is usu. measured in money or for a given period of time, derives from capital, labor, or a combination of both *** : commercial revenue or receipts of any kind except receipts or returns of capital." *Webster's* at 1143. The term "operation" in this context typically means "the whole process of planning and operating a business or other organized unit" or "a phase of business or of business activity." *Webster's* at 1581 (providing, as examples of that usage, the "operation" of a large household or steel mill).

That general meaning of "operation" is consistent with how the term "operation" was used throughout other parts of the gambling statutes in 1974. For example, a person qualified as a "player" if the person did not "otherwise render material assistance to the establishment, conduct *or operation thereof by performing, without fee or remuneration, acts directed toward the arrangement or facilitation of the game*, such as inviting persons to play, permitting the use of premises therefor and supplying cards or other equipment used therein." ORS 167.117(7) (1973) (emphasis added). By implication, "acts directed toward the arrangement or facilitation of the game" were part of the operation of the game. It was only if those activities were performed "without fee or

---

*accommodation where no house player, house bank or house odds exist and the gross income from the operation of the social game does not exceed 25 percent of the gross income of the private business, private club or public accommodation.*]

   "**(a) A game, other than a lottery, between players in a private home where no house player, house bank or house odds exist and there is no house income from the operation of the social game; and**

   "**(b) If authorized pursuant to section 3 of this 1974 Act, a game, other than a lottery, between players in a private business, private club or place of public accommodation where no house player, house bank or house odds exist and there is no house income from the operation of the social game.**"

Or Laws 1974, ch 7, § 1 (deletions in brackets and italics; additions in bold). The cross-referenced provision, section 3, essentially replaced the 1973 statute that allowed cities and counties to prohibit or regulate social games; it provided that "[c]ounties and cities may, by ordinance, authorize the playing or conducting of a social game in a private business, private club or in a place of public accommodation. Such ordinances may provide for regulation or licensing of the social games authorized." Or Laws 1974, ch 7, § 3.

remuneration" that the person performing them would still remain a "player" for purposes of ORS 167.117(7) (1973).

We agree with the Lottery that, in light of that text and context, the phrase "house income from the operation of the social game" most plausibly refers to any benefit that the "house" derives not from the mere presence of the social game (such as increased food and beverage sales or attendance) but from the operation of the game itself—including fees for accessing the games. The games operated in the Portland Meadows Gaming Room were an incentive to pay the door fee and enter the room, and those fees come within the plain meaning of the phrase "house income from the operation of the social game."

In arguing for a contrary interpretation, ORI again focuses on the distinction between "banked" and "percentage" games. It argues that the 1973 legislature intended to preclude only the former and to allow gambling enterprises to receive the latter—direct income in the form of a rake. Through that lens, ORI views the 1974 change to "no house income" to be a far more limited restriction on the house taking a percentage from the operation of the game, not as a restriction on the ability of card rooms to charge fees for accessing the games.

ORI finds some support for its view in the 1974 legislative history—including statements made during the floor debates about "seat charges." For example, Representative Glen Otto asked Representative Norma Paulus, the carrier of the bill (HB 3327), about a house "take" if he played a friendly game of rummy at the Rialto. She answered:

> "This—as the bill comes to you now, it excludes the 25% of limitation on the house that was in before so that the house could not get a *part or skim off part of the game but they could do under this bill is charge for the seat, but they couldn't get a percentage of the profits*."

Tape Recording, House Floor Debate, HB 3327, Feb 23, 1974, Reel 6, Track II (statement of Rep Normal Paulus) (emphasis by ORI).

The difficulty for ORI's argument, as the Lottery points out, is that Representative Paulus thereafter made

a statement suggesting that indirect income from the operation of the game *was* prohibited. Immediately after the remark about a seat charge, Representative Otto asked for clarification on whether the house could charge "a fee for using the equipment and tables," to which Representative Paulus answered "no." *Id.* And statements by another representative during the floor debate are ambiguous as to whether "reasonable service charges" would include table or seat charges:

> "The 25 percent is unnecessary if the house is operating the game to be a participating gamer, or if you will, a gambler. There's really no necessity for the house to do that. *If the house wants to provide a service for those who are participating, the house can charge a reasonable service for what is provided. If it's a table for so long, if it's a seat for so long, that's another matter.* But there's no real policy of law that's served by encouraging the house itself to become a party to the gaming."

*Id.* (statement of Rep Lewis Hampton) (emphasis added).

Ultimately, this is a case in which we cannot say with any degree of confidence that particular comments by individual legislators, even the carrier, represented the views of the entire body as to the meaning of the phrase "house income from the operation of the social game." *See Vasquez v. Double Press Mfg., Inc.*, 364 Or 609, 632, 437 P3d 1107 (2019) ("As this court noted in *Gaines*, one of the pitfalls that is 'most fraught with the potential for misconstruction' is reliance on the statement of a single legislator or witness to misattribute that person's understanding of a provision to the legislative body as a whole."). If anything, the comments appear to reflect a range of perspectives on the virtues and vices of the business side of social gaming. For that reason, we rely on the text and context of ORS 167.117(21) to conclude, as the Lottery did, that a "door fee" that is paid to access poker games results in "house income" within the meaning of the statute.

Affirmed.