Argued and submitted May 4; decision of Court of Appeals affirmed, judgment of circuit court vacated, and case remanded to circuit court for further proceedings November 4, 2021

Phillip E. OWEN,
an individual;
Owen Properties, LLC,
an Oregon limited liability company;
and Michael L. Feves, an individual,
*Petitioners on Review,*

*v.*

CITY OF PORTLAND,
an Oregon municipal corporation,
*Respondent on Review.*

(CC 17CV05043) (CA A165633) (SC S068000)

497 P3d 1216

The city enacted an ordinance requiring landlords to make relocation assistance payments to tenants in some circumstances, based in part on rent increases; the ordinance also created a cause of action for tenants against landlords that violate the ordinance. Plaintiffs challenged portions of that ordinance as preempted by a state law regarding rent regulation by local governments and as beyond the city's constitutional home-rule authority. The trial court entered summary judgment in favor of the city, and the Court of Appeals affirmed. *Held*: (1) The city's ordinance does not "control[] the rent that landlords may charge for the rental of any dwelling unit," ORS 91.225(2), and is therefore not preempted; and (2) the ordinance's creation of a cause of action is permissible under the city's home-rule authority and the state constitution.

The decision of the Court of Appeals is affirmed. The order of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings.

On review from the Court of Appeals.*

John DiLorenzo, Jr., Davis Wright Tremaine LLP, Portland, argued the cause for petitioners on review. Kevin H. Kono filed the briefs for petitioners on review. Also on the briefs was John DiLorenzo, Jr., Portland.

Denis M. Vannier, Office of the City Attorney, Portland, argued the cause and filed the brief for respondent on review.

_____

* Appeal from Multnomah County Circuit Court, Henry C. Breithaupt, Judge pro tempore. 305 Or App 267, 470 P3d 390 (2020).

Sara Kobak, Schwabe, Williamson & Wyatt, PC, Portland, filed the brief for *amicus curiae* Oregon Realtors. Also on the brief was W. Michael Gillette, Portland.

Emily M. Matasar, Beery, Elsner & Hammond, LLP, Portland, filed the brief for *amicus curiae* League of Oregon Cities. Also on the brief was Chad A. Jacobs, Portland.

Emily Rena-Dozier, Oregon Law Center, Portland, and Diane D. Nguyen, Legal Aid Services of Oregon, Portland, filed the brief for *amici curiae* Oregon Law Center and Legal Aid Services of Oregon. Also on the brief was MariRuth Petzing, Oregon Law Center, Portland.

Phil Goldsmith, Law Office of Phil Goldsmith, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Walters, Chief Justice, and Balmer, Nakamoto, Flynn, Nelson, and Garrett, Justices.**

BALMER, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings.

Garrett, J., dissented and filed an opinion.

_____
** Duncan, J., did not participate in the consideration or decision of this case.

**BALMER, J.**

At issue in this case is a challenge to a City of Portland ordinance requiring landlords to pay relocation assistance to displaced tenants in certain circumstances. Plaintiffs are landlords that rent property in the city. Plaintiffs filed a declaratory judgment and injunction action against the city contending, as relevant here, that ORS 91.225 preempts the ordinance at issue and that the ordinance impermissibly creates a private cause of action that a tenant may bring against a landlord that violates the ordinance. On review, we conclude that ORS 91.225, which prohibits municipalities from "enact[ing] any ordinance or resolution which controls the rent that may be charged for the rental of any dwelling unit," ORS 91.225(2), with certain exceptions, does not prevent municipalities from enacting other measures that may affect the amount of rent that a landlord charges or may discourage a landlord from raising its rents. We further hold that ORS 91.225 does not preempt the city's ordinance. We also reject plaintiffs' contention that the ordinance impermissibly creates a private cause of action.

## I.  BACKGROUND

The Oregon legislature enacted what is now ORS 91.225 as a temporary measure in 1983. Or Laws 1983, ch 708, §§ 3-5. The legislature made that measure permanent in 1985 with some amendments. Or Laws 1985, ch 335. As now codified, ORS 91.225 reads:

"(1)  The Legislative Assembly finds that there is a social and economic need to insure an adequate supply of affordable housing for Oregonians. The Legislative Assembly also finds that the imposition of general restrictions on housing rents will disrupt an orderly housing market, increase deferred maintenance of existing housing stock, lead to abandonment of existing rental units and create a property tax shift from rental-owned to owner-occupied housing. Therefore, the Legislative Assembly declares that *the imposition of rent control on housing in the State of Oregon is a matter of statewide concern*.

"(2)  Except as provided in subsections (3) to (5) of this section, *a city or county shall not enact any ordinance or*

*resolution which controls the rent that may be charged for the rental of any dwelling unit.*

"(3)   This section does not impair the right of any state agency, city, county or urban renewal agency *** to approve rent increases, establish base rents or establish limitations on rents on any residential property for which it has entered into a contract under which certain benefits are applied to the property for the expressed purpose of providing reduced rents for low income tenants.

"*****

"(7)   *** The electors or the governing body of a city or county shall not enact, and the governing body shall not enforce, any ordinance, resolution or other regulation that is inconsistent with this section."

ORS 91.225 (emphases added). ORS 90.100(38) defines "rent" as used in ORS 91.225 as, in relevant part, "any payment to be made to the landlord under the rental agreement, periodic or otherwise, in exchange for the right of a tenant *** to occupy a dwelling unit." The statute does not define "control" or "rent control."

Thirty-two years after the legislature enacted that statute, the city sought to address the displacement of residential tenants from rental properties. In 2017, the city council passed Ordinance 188219, which amended the Portland City Code to require landlords to pay a sum for "relocation assistance" to tenants in certain circumstances, including when a landlord increases the rent of a unit by 10 percent or more within a 12-month period and the tenant gives notice that they intend to terminate the agreement.[1]

---

[1] The relevant provision of Portland City Code (PCC) 30.01.085 (2017), *amended by* Ordinances 188519, 188558, 188628 (2017), 188849 (2018), 189421, 189726 (2019), as established by the ordinance here reads, in part:

"If, within 14 days after a Tenant receives an Increase Notice indicating a Rent increase of 10 percent or more within a 12 month period[,] *** a Tenant provides written notice to the Landlord of the Tenant's intent to terminate the Rental Agreement ***, then, within 14 days of receiving the Tenant's Notice, the Landlord shall pay to the Tenant Relocation Assistance in the amount that follows: $2,900 for a studio or SRO Dwelling Unit, $3,300 for a one-bedroom Dwelling Unit, $4,200 for a two-bedroom Dwelling Unit and $4,500 for a three-bedroom or larger dwelling unit."

The ordinance also requires relocation assistance payments when a landlord evicts a tenant through a "no-cause" eviction. "No-cause" eviction occurs when a landlord ends a tenancy without any predicating misconduct by the tenant.

The amount of relocation assistance required varies from $2,900 for a studio to $4,500 for larger units. The ordinance permits a tenant to bring an action against a landlord that fails to comply:

> "A Landlord that fails to comply with any of the requirements set forth in this Section 30.01.085 shall be liable to the Tenant for an amount up to 3 months Rent as well as actual damages, Relocation Assistance, reasonable attorney fees and costs (collectively, 'Damages'). Any Tenant claiming to be aggrieved by a Landlord's noncompliance with the foregoing *has a cause of action in any court of competent jurisdiction* for Damages and such other remedies as may be appropriate."

PCC 30.01.085(D) (2017) (emphasis added).

Plaintiffs filed this action seeking a judgment both declaring portions of the ordinance to be invalid and permanently enjoining enforcement of the ordinance. Plaintiffs contended, among other things, that portions of the ordinance were preempted by ORS 91.225 and that others exceeded the city's authority under its charter in violation of the state constitution. On cross-motions for summary judgment, the trial court held that "[i]f the legislature had intended to proscribe ordinances that had the indirect effect of controlling rents it could have said so," and further held that because ORS 91.225 had more than one plausible construction, that ambiguity should be resolved in favor of the local home-rule jurisdiction. The trial court accordingly denied plaintiffs' motion for summary judgment and granted the city's motion. Plaintiffs appealed, reprising several of their arguments that the ordinance was invalid.

The Court of Appeals affirmed the substance of the trial court's decision. The court concluded that the trial court properly granted the city's motion for summary judgment and denied plaintiffs' motion, but it also held that the trial court's general judgment dismissing the complaint was

---

No-cause evictions are permitted only in certain circumstances, such as in week-to-week tenancies, in the first year of month-to-month tenancies, or at the end date of a fixed term tenancy. ORS 90.427. Plaintiffs challenged that provision of the ordinance in the trial court and the Court of Appeals but were unsuccessful. In this court, plaintiffs do not renew their claim regarding the "no-cause" eviction provision of the ordinance, and we do not discuss it further.

not the proper disposition of plaintiffs' declaratory judgment action. *Owen v. City of Portland*, 305 Or App 267, 286, 470 P3d 390 (2020). Accordingly, the Court of Appeals vacated the judgment and remanded the case to the trial court, directing it to issue a judgment declaring the respective rights of the parties. *Id.* at 286-87. We allowed plaintiffs' petition for review.[2]

## II.  PREEMPTION AND THE TENANT RELOCATION ASSISTANCE ORDINANCE

The first issue is whether the ordinance's requirement that landlords pay relocation assistance to tenants in certain circumstances "controls the rent that may be charged" for purposes of ORS 91.225(2) and is therefore preempted by that statute. The ordinance requires such payments to tenants whose rent has increased by more than 10 percent in 12 months and who choose to relocate rather than pay that higher rent. For the reasons discussed below, we conclude that ORS 91.225 does not preempt the ordinance.

### A.  *State Law Preemption*

Article XI, section 2, of the Oregon Constitution provides "home rule" for cities and towns that adopt municipal

---

[2] In 2019, while this case was pending in the Court of Appeals, the Oregon legislature adopted a statute providing that landlords may not increase rents in a 12-month period more than seven percent plus that year's increase in the regional Consumer Price Index (CPI). ORS 90.323. The city now argues that that statute renders "any continued impact of the Ordinance on plaintiffs speculative," and that, as a result, plaintiffs lack standing and review should be dismissed as improvidently allowed. The city points out that, in 2020 and 2021 respectively, according to the Oregon Office of Economic Analysis, the maximum allowable rent increases were 9.9 percent and 9.2 percent. The city argues that state law "now generally bars landlords from raising rents in an amount that might trigger the requirements of the Ordinance."

We disagree with the city's argument. Although ORS 90.323 may in some years prevent landlords from increasing rents to levels that would trigger the ordinance, the CPI could also increase three percent or more in a given year, in which case a landlord could increase rents above the 10 percent threshold. For example, from September 2020 to September 2021, the relevant CPI increased 5.3 percent. *See* U.S. Bureau of Labor Statistics, *Consumer Price Index, West Region—September 2021* (Oct 13, 2021), *available at* https://www.bls.gov/regions/west/news-release/consumerpriceindex_west.htm (accessed Oct 29, 2021). We do not find, given the variance in annual CPI changes, that the impact of the ordinance on plaintiffs is so speculative as to divest them of standing to seek a declaration invalidating the ordinance.

charters.[3] *Gunderson, LLC v. City of Portland*, 352 Or 648, 659, 290 P3d 803 (2012). Portland has adopted such a charter. Laws adopted pursuant to that home-rule authority cannot conflict with state legislation. "[H]ome-rule municipalities possess authority to enact substantive policies, even in areas also regulated by state law, so long as the local enactment is not incompatible with state law." *Id.* (internal quotation marks omitted). The analytical process for determining whether state law preempts a local law in Oregon is well established:

> "[B]oth municipalities and the state legislature in many cases have enacted laws in pursuit of substantive objectives, each well within its respective authority, that were arguably inconsistent with one another. In such cases, the first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent. However, when a local enactment is found incompatible with a state law in an area of substantive policy, the state law will displace the local rule."

*LaGrande/Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978) (citations and footnote omitted).

The question, then, is whether a local law is "incompatible" with state law, "either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *Id.* To protect the constitutional interests of municipalities in exercising their home-rule authority, the state must be particularly clear when preempting local legislative authority, and we interpret local enactments to

---

[3] Article XI, section 2, provides, in part:

"The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

function consistently with state law if possible. *Id*. Here, plaintiffs have the heavy burden of showing that state law preempts the city's ordinance. *See Rogue Valley Sewer Services v. City of Phoenix*, 357 Or 437, 454, 353 P3d 581 (2015) ("A party that challenges a home-rule city's authority as preempted by state law is required to show that the legislature 'unambiguously' expressed its intent—a high bar to overcome." (Quoting *Gunderson*, 352 Or at 663.)). Because the ordinance was promulgated under Portland's constitutional home-rule authority, the state statute's preemption of the ordinance must be unambiguous; if there is ambiguity, the ordinance is not preempted. *Cf. State ex rel Haley v. City of Troutdale*, 281 Or 203, 211, 576 P2d 1238 (1978) (legislative intent to preempt certain local construction standards was "not unambiguously expressed" and therefore not preempted).

There is no evidence, nor do plaintiffs contend, that the ordinance and ORS 91.225 cannot operate concurrently. Thus, the question boils down to whether the legislature "unambiguously expressed its intent" to preempt laws like the ordinance, and we turn to that issue. *Rogue Valley Sewer Services*, 357 Or at 454 (internal quotation marks omitted).

B.    *ORS 91.225's Text in Context*

To interpret ORS 91.225, we begin by examining its text in context. *See Eugene Water and Electric Board v. PERB*, 365 Or 59, 68, 442 P3d 596 (2019) (statutory interpretation "typically involves examining the text in context, and considering any pertinent legislative history, to determine legislative intent"). The parties' arguments and our analysis focus on the operative text in subsection (2)—"a city or county shall not enact any ordinance or resolution which controls the rent that may be charged"—but also touch on subsections (1), (3), and (7).

Plaintiffs contend that the text of ORS 91.225(2) plainly preempts "[a]ny local enactment that exerts influence over the rent that may be charged."[4] Specifically, plaintiffs

---

[4] Plaintiffs inconsistently articulate which local laws they assert are preempted by ORS 91.225. That is unfortunate, because the proper understanding of which laws are preempted is a central issue in this case. Plaintiffs variously describe the state statute as preempting local laws that "exercis[e] influence"

assert that the legislature's use of the phrase "ordinance or resolution which *controls* the rent," ORS 91.225(2) (emphasis added), instead of the more colloquial phrase "rent control" used in subsection (1), indicates that the legislature intended subsection (2) to have a broad preemptive effect. Plaintiffs further contend that subsection (7), which bars the enactment and enforcement of ordinances, resolutions, or other regulations that are "inconsistent" with ORS 91.225, is a "catchall" provision that has independent preemptive effect. Plaintiffs' core argument is that ORS 91.225 preempts any local law that "exercises influence" over the rents that landlords charge and that the ordinance here does so.

The city contends that the text and context of ORS 91.225 indicate that the legislature primarily intended to bar local measures that constitute "rent control," which the city understands to be "government regulation of *the amount* a landlord may charge for rent." In the city's view, ORS 91.225 preempts only local laws that legally bar landlords from setting their rent at whatever rate they wish. The city specifically interprets the language in subsection (2) barring any local law that "controls the rent that may be charged" to preempt only local legislation that regulates the "price demanded" or "charged" by landlords for their rental units. The city observes that the ordinance does not regulate that price and that landlords are free to adjust rents in response to market conditions after complying with the ordinance's modest procedures. The city rejects plaintiffs' claim that subsection (7) expands the scope of what constitutes "rent control" or laws that "control[] the rent that may be charged." Instead, the city argues, subsection (7) adds only a bar on "enforc[ing]" those laws preempted by subsection (2) or "other regulation" that controls rent. At bottom, the city argues that ORS 91.225 preempts only local laws that regulate the price that landlords may charge

_____

over, "regulate," "exert[] influence" over, "exert restraining influence" over, "produce the effect of influencing," and simply "influence" rent. That shifting language elides the critical difference between laws that "control" and laws that merely "influence," and many of plaintiffs' proposed interpretations reach beyond what the definitions of the statute's words allow. As discussed below, we reject the conclusion that the legislature intended to preempt all local laws that might have some influence on the rents charged by landlords but that do not reach the level of controlling the rent.

for their rental units, and that the ordinance here does not do so.

We begin our statutory interpretation with the operative wording of ORS 91.225(2) and examine first the word "controls." As a verb, "control" here means "to exercise restraining or directing influence over : REGULATE, CURB." *Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002). Applying that definition, we understand subsection (2) by its plain meaning to refer to local laws that "regulate" or "exercise *restraining* or *directing* influence over" the rent that landlords may charge. *Id.* (emphases added). We reject plaintiffs' assertion that subsection (2) refers to all local laws that may "exercis[e] influence"—*any* influence—over rent amounts. Whether a law "exercises influence" generally is different from and broader than whether it *controls* by exercising "restraining" or "directing" influence.[5]

A useful comparison is the express exception in subsection (3) to the statute's preemption of any local law that "controls the rent" in subsection (2). Subsection (3) *permits* local authorities to "approve rent increases, establish base rents or establish limitations on rents" for certain affordable housing properties. ORS 91.225(3). The acts that "control[] the rent" in that subsection are the "approv[al]" of rent increases and "establish[ment]" of maximum or minimum rent amounts, all of which do not merely influence, but directly regulate, rent. The use of those phrases in subsection (3) does not necessarily mean that those are the only examples of laws that might "control[] the rent" under subsection (2). But those words support our understanding of "control[] the rent" to refer to laws which exercise "restraining" or "directing" influence over rents, and not to all laws that might have an influence on rents.

---

[5] The dissent asserts that the word "control" "connotes purposive action," and that ORS 91.225 therefore preempts any local laws "*aimed*" at controlling rent. 368 Or at 688 (Garrett, J., dissenting). The dissent purports to explain that connotation with legislative history indicating that the legislature was concerned with local attempts to enact rent control. But the dissent does not point to anything in the operative wording of the state law that would preempt local laws regarding rental properties because they were "*aimed*" at a particular purpose. None of the definitions discussed disclose any such connotation, and absent clear direction from the legislature, we decline to read that meaning into the statute. Put another way, the legislature could have barred local laws that were enacted *for the purpose* of controlling the rent, but it did not do so here.

Although subsection (1) is a statement of legislative findings and not an operative statutory directive, it supports our understanding of the phrase "controls the rent" in subsection (2). "Control" as a noun, which is how it is used in subsection (1), means, among other things, "the regulation of economic activity esp. by government directive <price ~*s*> <wage ~*s*> <rent ~>." *Webster's* at 496. As a phrase, "rent control" means "government regulation of the amount charged as rent for housing and often also of eviction." *Id.* at 1923; *see also Black's Law Dictionary* 1166 (5th ed 1979) (defining "rent control" as "[a] restriction or limitation imposed in certain cities upon the maximum rent that may be charged on rental property"). Along with declaring "rent control" to be a matter of statewide concern, subsection (1) also describes the potential negative impacts of imposing "general restrictions on housing rents." Although "rent control" and "general restrictions on housing rents" are not necessarily equivalent, we understand those phrases to refer to similar concepts. Based on the above definitions and other language in the subsection, we interpret "rent control" in subsection (1) to mean, as commonly understood, "regulation of the amount charged as rent" for a dwelling unit. *Webster's* at 1923.

Regarding the distinction between the phrases "controls the rent" and "rent control," we reject plaintiffs' argument that the legislature's choice of active verb over phrasal noun in subsection (2) expands the preemptive reach of ORS 91.225. Plaintiffs offer no definitions of "control" as a noun or a verb that support their claim that the verb in subsection (2) has any broader meaning that the noun in subsection (1). They instead rely on an implicit sense that "rent control" has a collectively understood colloquial meaning (one that they do not articulate) that should not restrict the meaning of "controls the rent," and they point to cases where this court has previously interpreted the nominal and verbal forms of a word differently. *E.g., State v. Glushko/Little*, 351 Or 297, 311, 266 P3d 50 (2011) (differences between "consent" as a noun and as a verb); *State v. Bray*, 342 Or 711, 719 n 6, 160 P3d 983 (2007) (differences between "display" as a noun and as a verb). In both of those cases, however, the dictionary definitions of the words at issue were different depending on whether the word was used as a verb or as a noun.

Here, in contrast, the dictionary indicates that the noun "control" and the verb "to control" have substantially the same meanings. We agree with plaintiffs that the form of the words that the legislature chooses in drafting a statute can be significant, but plaintiffs do not substantiate their claim that the switch from noun to verb is significant here. Furthermore, consistent with plaintiffs' argument, we do not restrict our understanding of "rent control" to mean only laws resembling the early generations of rent control practices, where local governments sometimes established maximum rents for thousands of individual housing units based on considerations of land cost, unit size, utilities, taxes, a rate of return on the landlord's investment, and so on. *See generally* Kenneth K. Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade*, 35 Rutgers L Rev 723 (1983) (comparing the stringent first generation of postwar rent control with the more permissive second generation and reviewing various components of rent control regimes and related statutes). We agree that this statute might preempt more than one type of ordinance, but the fact that rent control can be structured in multiple ways does not resolve whether the ordinance here controls the rent and does not lead us to alter our understanding of ORS 91.225. We simply understand "rent control" to mean any law which, as the legislature put it, "controls the rent." ORS 91.225(2).

We also consider the possibility raised by plaintiffs that, although the legislature may have been responding to perceived problems with direct government regulation of rent levels and rent increases, it used the broader wording of "controls the rent" in ORS 91.225(2) to encompass local ordinances or policies that go beyond those traditional aspects of "rent control." *See South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986) ("The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention."). We agree with plaintiffs that ORS 91.225's preemption is not necessarily limited to only forms of rent control that were common in the 1980s. But the principle set out in *South Beach Marina, Inc.* does not mean that we should reach beyond the text and context of ORS 91.225 for a broader meaning of "rent control."

We next consider the phrase, "the rent that may be charged." ORS 91.225(2). As noted above, "rent" is statutorily defined, in part, as "any payment to be made to the landlord under the rental agreement, periodic or otherwise, in exchange for the right of a tenant * * * to occupy a dwelling unit." ORS 90.100(38). ORS 91.225 does not define "may" or "charged." Neither the city nor plaintiffs offer any specific interpretations of the word "may" in this phrase but, as used here, "may" has two potentially applicable meanings. In this grammatical context, "may" could mean "have permission to" (or "have liberty to"), *Webster's* at 1396, thus describing the rent that landlords have *permission*, or liberty, to charge. Alternatively, "may" could mean "be in some degree likely to," *id.*, thus describing the rent that landlords are *in some degree likely* to charge.

We readily conclude that the first meaning of "may" ("have permission to") applies in this statute for two reasons. First, as discussed, ORS 91.225(2) is explicitly limited by subsection (3), which permits local authorities to "approve rent increases, establish base rents or establish limitations on rents" for certain affordable housing properties. Those exceptions describe situations where local authorities have permission to regulate what rent amounts or changes are permitted. Thus, subsection (2) likely refers to situations where, in contradistinction to the exceptions, local authorities may *not* regulate what rent amounts or changes are permitted.

Second, the alternative definition of "may," which must apply under plaintiffs' view of the statute, is not plausible in the context of ORS 91.225. If the statute barred any resolution or ordinance that regulated or exerted restricting or directing influence over the amount of rent that landlords might "be in some degree likely to" charge, it would likely bar any local law potentially affecting the housing market, from trash collection or compost ordinances to city efforts to support local businesses and industries and thereby encourage more people to move to the city, all of which could affect the rents landlords might "be in some degree likely to" charge. We do not believe ORS 91.225's preemptive effect extends so far.

We next consider plaintiffs' argument that ORS 91.225(7) reinforces their interpretation that ORS 91.225 broadly preempts ordinances that influence rent. That provision provides, in part, that "[t]he electors or the governing body of a city or county shall not enact, and the governing body shall not enforce, any ordinance, resolution or other regulation that is inconsistent with this section." Plaintiffs argue that, for subsection (7) to have any substantive meaning, the only "plausible interpretation" of that subsection is one that gives it independent preemptive effect. Plaintiffs contend that subsection (7) therefore reaches beyond subsection (2) to preempt any laws "inconsistent with" ORS 91.225 as a whole. Whether a law is inconsistent with ORS 91.225, however, depends on the meaning of that statute itself. The Court of Appeals concluded that "ORS 91.225(7) only reinforces the prohibition on rent control by explicitly prohibiting local electors from enacting and local governments from enforcing local rent control regulation." *Owen*, 305 Or App at 279. We agree. Subsection (7) does not expand the reach of ORS 91.225 to have the "broad preemptive effect" that plaintiffs seek. If it has any independent meaning at all, it is simply to reinforce the clear, but limited, preemption in subsection (2) by barring enactment and enforcement of local rent control regulation, and subsection (7) does not alter our understanding of ORS 91.225 as a whole as applied to this ordinance.

Particularly when considered in light of our cases holding that state law can preempt home-rule authority only when, and to the extent that, the party urging preemption can demonstrate that "the legislature unambiguously expressed its intent—a high bar to overcome," *Rogue Valley Sewer Services*, 357 Or at 454 (internal quotation marks omitted), plaintiffs' argument based on the text and context of ORS 91.225 is unavailing.

C.  *Legislative History*

Having analyzed the key terms of ORS 91.225 in context, we turn next to that statute's legislative history for further clarification. Plaintiffs assert that that legislative history supports interpreting ORS 91.225(2) "as preempting all forms of rent control, not only express caps on rent."

Relying on the brief of *amicus curiae* Oregon Realtors, plaintiffs assert that "'rent control' covers a wide range of local enactments targeted at restricting a landlord's right to set rent charges at free-market levels."[6] We examine the legislative history presented by *amicus* and come to a different conclusion.

*Amicus* reviews testimony before the legislature on the topic of rent control before ORS 91.225 was enacted. That testimony, *amicus* emphasizes, referred to a wide range of potential rent control measures. *Amicus* also cites two California Court of Appeal cases discussing a complex rent control ordinance in Los Angeles. Based on the variety of potential forms of "rent control," *amicus* concludes that ORS 91.225 does not preempt solely laws setting direct limits on allowable rent amounts. But the fact that the legislature heard testimony regarding various local government efforts to affect, influence, or regulate rental rates and the rental housing market generally does not mean that the statute that the legislature subsequently passed responded to or addressed that testimony. At most, we can infer from the range of testimony that members of the legislature were made aware that there were multiple methods for municipalities to affect rental markets. Indeed, the fact that legislators were likely aware of the broad range of local measures that might affect rental markets but nonetheless chose only to preempt those laws that "control[] the rent that may be charged" appears to support the city's argument that the legislature intended to preempt only traditional forms of rent control, and not all measures that might influence rental markets.

*Amicus* Oregon Realtors also contends that relocation assistance to displaced tenants was part of local

---

[6] Plaintiffs do not define or offer any criteria to determine what would be a "free-market level" for rent. Given the existing regulatory framework for housing aside from the city's ordinance, we question whether such "free-market levels" are meaningfully attainable. The law review article *amicus* cites for support of this concept refers to the "fair market rental" of a property, a different phrase from "free-market level," and one that allows for the possibility of some regulation impacting that market. Richard A. Epstein, *Rent Control and the Theory of Efficient Regulation*, 54 Brook L Rev 741, 746 (1988). Moreover, nothing in ORS 91.225 suggests that "free-market" rents were the goal of the statute, and we reject plaintiffs' invitation to read that into the statute.

rent control laws in effect in other jurisdictions when the legislature enacted ORS 91.225, and that the legislature therefore intended that statute to preempt relocation assistance as well as rent control. *Amicus* cites as examples laws from Washington, D.C. and Santa Monica, California. Rental Housing Conversion and Sale Act Amendment Act of 1981, 28 D.C. Reg. 2824 (Aug 1, 1981); Santa Monica, Cal., Municipal Code §§ 4850-4862 (1986) (Ordinances 1374CCS, 1375CCS), *renumbered as* §§ 4.36.010-.150 (2021).

That argument is unpersuasive. *Amicus* does not offer any evidence from the legislative history indicating that those laws were on the minds of the legislators when they drafted ORS 91.225. We cannot infer from those laws' mere existence in 1985 that they informed the legislature's choice of statutory wording. Based on our review of the legislative history, the only indications that those examples were raised before the legislature were brief mentions by a representative of the Oregon State Home Builders Association during a 1985 hearing that Santa Monica had extended rent control to commercial buildings, Testimony, House Committee on Judiciary, HB 2505, Apr 30, 1985, Ex K (testimony of James Irvine, Oregon State Home Builders Association and The Multifamily Housing Council of Oregon), and that Washington, D.C. was attempting to end its rent control program. Minutes, House Committee on Judiciary, Subcommittee 2, HB 2505, Apr 30, 1985, 8 (so stating). Moreover, that hearing postdated the enactment of the temporary 1983 precursor to ORS 91.225, where the terms "rent control" and "controls the rent" were first used, suggesting that the cited testimony, and the example of the District of Columbia law, did not affect the wording used by the legislature.

Even if those examples of relocation assistance were on the minds of the legislators who enacted ORS 91.225, they do not support plaintiffs' or *amicus*'s arguments. The District of Columbia law, for example, was not a "rent control" law. Our review of that law beyond the excerpt provided by *amicus* indicates that it was named the "Rental Housing Conversion and Sale Act Amendment Act of 1981." 28 DC Reg 2824. That law required payments to tenants who were displaced when, as that law's title suggests, their

rental buildings were converted to cooperatives or condominiums. That law did not require payments when tenants were displaced by rent increases—in fact, that law did not mention rent increases at all. Moreover, the law is now codified in chapter 34 of the district's real property code, DC Code sections 42-3401.01 to 42-3405.13, whereas the district's "rental stabilization program" is codified separately at chapter 35, subchapter II, *id.* §§ 42-3502.01 - 42-3502.24. ORS 91.225 itself contemplates permissible condominium conversion ordinances, implicitly distinguishing them from laws which control the rent. ORS 91.225(4) (permitting condominium conversion statutes to include a certain type of time-limited rent restriction). Even if we were to assume that the District of Columbia housing conversion law could be considered a "rent control" law that influenced legislature's choices in drafting ORS 91.225, that law is not similar enough to the ordinance here to even suggest that the legislature intended to preempt laws like the Portland ordinance at issue.

The Santa Monica ordinance cited by *amicus* requires landlords to pay a relocation fee to displaced tenants in certain circumstances, such as when the landlord withdraws certain rent-controlled units from the market or seeks to recover possession of the unit for personal or family use. Santa Monica, Cal., Municipal Code § 4.36.020. Nowhere does that ordinance refer to rent increases or provide for payments to tenants displaced due to rent increases. Neither the District of Columbia nor Santa Monica law is the kind of tenant relocation assistance that plaintiffs here contend is rent control.

Nonetheless, *amicus* seems to argue that, because some cities had some other versions of rent control—the District of Columbia at the time limited annual rent increases to a certain percentage of existing rent and Santa Monica imposed rent freezes and ceilings at various times—then the relocation fees at issue here must also constitute "rent control." That argument is unpersuasive. We do not agree that, because some jurisdictions provided for various kinds of relocation assistance in circumstances *not* involving rent increases, that the legislature necessarily considered all relocation assistance payments to constitute "rent control."

No legislative history offered by either party provides much help in answering the specific interpretive question in this case. The legislature did not appear to consider whether ordinances that do not directly prescribe or prohibit rent amounts, but that would nevertheless impose some costs and procedural requirements on raising rents in certain circumstances, constitute "rent control" under ORS 91.225. Thus, we rely on our understanding of ORS 91.225 based on its text and context and turn to the ordinance at issue.

D.   *Whether the Ordinance Controls the Rent or "Effectively" Does So*

We now consider whether the city's ordinance runs afoul of ORS 91.225's preemption of local laws. The ordinance could do so if it regulates or exercises restraining or directing influence over the rents that landlords may permissibly charge. Alternatively, plaintiffs argue, the ordinance could do so if it "effectively" constitutes rent control, which plaintiffs contend also would be preempted by the statute. We address those possibilities in turn and conclude, for the reasons discussed below, that the ordinance does neither.

First, we examine whether the ordinance here "controls the rent that may be charged" by landlords by exercising restraining or directing influence over the amounts that landlords have permission to charge. ORS 91.225(2). The city's ordinance neither mandates nor forbids landlords to set their rents at, above, or below a certain amount. Portland landlords retain their legal ability to set rents as they see fit. Landlords are free to change the rent to any amount whenever a tenant moves out. Landlords may also increase the rent 10 percent or more and avoid the relocation assistance payment if their tenant decides to stay and pay the increased rent. The ordinance here does not prescribe certain rent amounts or prohibit increases, actions which would likely constitute rent control, but rather mandates a payment as a procedural requirement that is triggered primarily by tenant displacement and by, in part, in some cases, some rent increases. The ordinance does not control the rent that landlords may charge.

Although not challenged by plaintiffs in this court, there are also other conditions under which landlords may be required to pay relocation assistance, such as following no-cause evictions. And even in cases where there is a rent increase of 10 percent or more, the relocation assistance payment is not triggered automatically by that rent increase, but rather by the tenant's subsequent decision to relocate. In short, there are no circumstances in which the rent for a particular property is subject to approval or disapproval by the city. Rather than restricting the particular amount of rent that a landlord may charge—a restriction that, depending on how it were structured, might well be preempted by ORS 91.225—the ordinance establishes a procedure that allows a landlord to charge the rent that it deems appropriate, but conditions certain rent increases on payment of relocation assistance to a departing tenant.

Plaintiffs contend that the characterization of the required payments as "relocation assistance" is a misleading "label" deployed by the city to circumvent ORS 91.225. Plaintiffs argue that the payments are in fact "significant penalties" imposed "to prevent landlords from raising rent." They support that argument by asserting that "the payment is only 'relocation assistance' if the recipient uses it as such, but there is no requirement that the recipient do so," and that recipients "may place the money in a savings account, use it for groceries, gift it to a family member, or put it to any other use the recipient sees fit."

That argument misses the mark for several reasons. First, just as plaintiffs argued regarding the legislature's use of "control" as a verb, the operative word choices here are significant. The ordinance's required payments are not identified as "penalties," but rather as "relocation assistance." Despite plaintiffs' assertions that the ordinance is a prohibition in all but name, attaching a condition to certain actions that displace tenants is not the same as prohibiting those actions and then imposing a financial penalty for violations of that prohibition.

Even if the "label" of "relocation assistance" were an unreliable indicator of the ordinance's meaning, the required payments are in fact not penalties because they are not paid

to the city for the purpose of punishing landlords, but rather are paid to displaced tenants to alleviate relocation costs imposed by displacement as a result of steep rent increases. *See* Ordinance 188219 § 1(13)-(14). Plaintiffs assert that the city covertly intended its ordinance to discourage rent increases, rather than aid tenants. That assertion is belied by the city's extensive studies of the rental housing market, tenant displacement, and homelessness. That work, outlined in the briefs of the city and *amici* supporting the ordinance as well as the ordinance itself, *id.* § 1(1), provided the factual underpinning for the 17 specific findings in section 1 of the ordinance about the importance of helping tenants displaced for economic reasons to locate new housing. *Id.* § 1. The city's expressions of its intent in and for the ordinance are more persuasive than plaintiffs' assertions that the city was simply trying to impose rent control through other means.[7]

Additionally, whether tenants who receive these payments use those specific funds for relocation costs or other purposes is immaterial. Even if the relocation assistance payment itself were not used for the inevitable costs of relocation, those funds could be used to offset such costs paid from other sources. Whether the relocation assistance payments mingle with tenants' other assets does not undermine the city's policy of assisting displaced tenants.

Finally, plaintiffs' argument is implausible in practice. By suggesting that the city cannot address tenant

---

[7] Indeed, the very discussions in the Portland City Council that plaintiffs argue show that the city was trying to engage in "rent control" actually demonstrate the opposite: The city council understood that, because of state preemption, it could *not* control the rents that landlords charged. Commissioner Eudaly, speaking in support of the proposed ordinance at a city council meeting on February 2, 2017, said, "This is a temporary emergency ordinance intended to stabilize or assist renters at risk of involuntary displacement during our housing crisis. We hope that it will be short lived. *But that will—that will require the state legislature to overturn the ban on rent control and give the city back its regulatory tools.*" Audio Recording, Portland City Council, Ordinance 188219, Feb 2, 2017, Part 21 of 27, at 11:16 (comments of Commissioner Chloe Eudaly), https://www.portlandoregon.gov/auditor/article/622981 (accessed Oct 29, 2021) (emphasis added). She understood, of course, that the relocation assistance would be a disincentive for raising rents, as well a source of financial assistance to renters displaced for economic reasons. But any actual local control over rents or rent increases would, she recognized, require a change in state law.

displacement and homelessness in a way that may also affect the rental market, plaintiffs seem to imply that a municipality must choose the narrowest method available to address social or economic problems in that municipality. (The dissent similarly suggests that, to avoid preemption, the city should have used "other means" to enact a relocation assistance program. 368 Or at 693 (Garrett, J., dissenting).) That implication is dubious. Elected officials may enact a law with consequences that extend beyond that law's immediate purpose; that a law has a secondary consequence, even an anticipated one, does not mean that the lawmaker enacted it for that reason. Were that not the case, then under ORS 91.225 no Oregon municipality could enact or enforce any local law that might tend to have any effect on rental markets, which would be a far-reaching effect unsupported by the text or legislative history of ORS 91.225 and one that was certainly not unambiguously expressed in the statute. In sum, considering the text of the ordinance, the ordinance's stated purposes, and the implausibility of plaintiffs' alternative interpretation, the mere fact that the ordinance may discourage landlords from raising the rent in certain circumstances does not by itself lead us to conclude that the ordinance is an impermissible end run around ORS 91.225.

We turn to plaintiffs' remaining argument that, even if requiring relocation payments based on rent increases does not control the rent explicitly, it effectively does so by imposing a prohibitive cost on landlords that seek to increase rents. We question whether such an ordinance would be preempted by ORS 91.225 on the sole ground that, although not constituting "rent control," the ordinance nonetheless "effectively" controls the rent because of its consequences in the rental market and therefore is the equivalent of controlling the rent. The legislature could have, but did not, unambiguously indicate in the statutory text that it intended to preempt laws that might have similar effects on rental markets as laws which actually control the rent. Even so, assuming without deciding that an ordinance that was "effectively" "rent control" or "effectively" controlled the rent would be preempted, we conclude that Portland's ordinance would still be valid.

We recognize that the ordinance may create a disincentive for qualifying rent increases, but contrary to plaintiffs' argument, the ordinance does not prohibit landlords from imposing such increases. As noted above, there is no legal prohibition in the ordinance on setting rents at any amount. Thus, to rise to the level of an effective prohibition, any economic disincentive would need to be so substantial that no rational landlord would raise the rent for an existing tenant more than 10 percent in one year. But that is not the case here.

Based on market rates for rental units in Portland, landlords whose rent increases trigger the relocation assistance payments under the ordinance can recoup their costs quickly. The city's reported 2020 average rent for studios was $1,196 per month. *See* Portland Housing Bureau, *State of Housing in Portland* 41 (Dec 2020), https://www.portland. gov/sites/default/files/2021/phb-soh-2020-web-part-2.pdf (accessed Oct 29, 2021). If a landlord renting a unit at that rate increased the rent exactly 10 percent in one year, incurring the $2,900 relocation assistance payment, and then increased the rent 9.9 percent the following year, the landlord could recoup the relocation payment and receive an additional $1,533 over those two years. Or, if the landlord felt that the market could bear a 20 percent increase, and the existing tenant leaves and is paid the relocation assistance, the landlord could recover all but $30 of the relocation assistance payment in the first year. The landlord in that situation could recover $2,840 in additional revenue the following year, or $4,545 if it raised the rent again by 9.9 percent.

Thus, although the ordinance may well have the effect of altering a landlord's calculus regarding how much it will increase the rent in any given 12-month period (and, as the dissent points out, strategic landlords may in some cases raise rents by 9.9 percent to avoid paying relocation assistance, 368 Or at 692 (Garrett, J., dissenting)), the ordinance does not amount to a *de facto* prohibition on rent increases in excess of 10 percent. Increases beyond that amount are contemplated and permitted by the ordinance, conditioned only on the payment of the prescribed relocation

assistance, and only when those rent increases are followed by the tenant's departure.

We conclude that Ordinance 188219 is consistent with ORS 91.225 and that it neither "controls" the rent nor "effectively" does so, in violation of that law. Therefore, ORS 91.225 does not preempt the ordinance.

### III.   PRIVATE CAUSE OF ACTION PROVISION

We turn to whether the private cause of action created by the ordinance violates Article VII (Original), section 9, of the Oregon Constitution and is therefore void. Because municipal law is a valid source of Oregon law and state courts are courts of general jurisdiction, we conclude that it does not.

Oregon circuit courts "ha[ve] general jurisdiction, to be defined, limited, and regulated by law in accordance with th[e] Constitution." Or Const, Art VII (Original), § 1. In interpreting this and other constitutional provisions, this court has explained that "[n]othing in the text of Article VII, section 1, or Article VII (Amended), section 1, imposes any limitations on the exercise of 'judicial power.'" *Couey v. Atkins*, 357 Or 460, 510, 355 P3d 866 (2015). The constitution provides that circuit courts have the authority to hear all claims arising under any source of law unless jurisdiction is exclusively vested in some other court:

> "All judicial power, authority, and jurisdiction not vested by this Constitution, or by laws consistent therewith, exclusively in some other Court shall belong to the Circuit Courts, and they shall have appellate jurisdiction, and supervisory control over the County Courts, and all other inferior Courts, Officers, and tribunals."

Or Const, Art VII (Original), § 9; *see also State v. Terry*, 333 Or 163, 186, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002) ("Under the Oregon Constitution, circuit courts have subject matter jurisdiction over all actions unless a statute or rule of law divests them of jurisdiction.").

Circuit courts in Oregon have long heard claims originating from a variety of sources. *See, e.g.*, *Barcik v. Kubiaczyk*, 321 Or 174, 179, 895 P2d 765 (1995) (federal law);

*Schultz v. First Nat. Bk. of Portland et al*, 220 Or 350, 358-59, 348 P2d 22 (1959), *reh'g den* (1960) (Nebraska law); *State Land Board v. Rogers*, 219 Or 233, 241, 347 P2d 57 (1959) (Bulgarian law); *State v. Sanchez-Llamas*, 338 Or 267, 108 P3d 573 (2005), *aff'd sub nom Sanchez-Llamas v. Oregon*, 548 US 331, 126 S Ct 2669, 165 L Ed 2d 557 (2006) (international law). Those sources include city ordinances. *See, e.g.*, *Brennen v. City of Eugene*, 285 Or 401, 591 P2d 719 (1979) (city employee held liable in tort for violating a duty created by city ordinance); *Lange v. Minton*, 303 Or 484, 738 P2d 576 (1987) (injured person could bring action against a dog owner for violating a city ordinance prohibiting animals "running at large").

Here, the ordinance provides that "[a]ny Tenant claiming to be aggrieved by a Landlord's noncompliance with the [ordinance] has a cause of action in any court of competent jurisdiction for Damages and such other remedies as may be appropriate." PCC 30.01.085(D) (2017). The Court of Appeals has previously held that "it is within the judicial power of the circuit court to adjudicate a private dispute that arises under Oregon municipal law." *Sims v. Besaw's Café*, 165 Or App 180, 189, 997 P2d 201 (2000). Plaintiffs argue, however, that *Sims* was wrongly decided or was at least overbroad, and that the ordinance here impermissibly enlarges common law and statutory duties and liabilities by requiring state courts to resolve disputes arising under municipal law. Plaintiffs thus contend that the city is attempting through the ordinance "to assert authority over state courts by requiring them to hear a new municipal cause of action, thus expanding state court jurisdiction beyond its constitutionally and statutorily defined limits." We conclude that the ordinance validly creates a cause of action that may be heard in state courts and does not violate the constitution.

In *Sims*, the Court of Appeals considered a Portland ordinance that prohibited employers from discriminating against current and prospective employees on several grounds. That ordinance provided a cause of action to people harmed by that conduct, which could be heard in "any court of competent jurisdiction." 165 Or App at 184. The plaintiff

filed an action against the defendants in circuit court for employment discrimination based on that ordinance. The city, which intervened, argued that the plaintiff was entitled to a declaration that he could litigate his municipal law claim in state court. *Id.* at 183.

The Court of Appeals explained that "[t]here have been instances in which Oregon cities have exceeded their authority by enacting ordinances that purported to give state courts authority to perform functions that they have not been authorized by state law to perform," *id.* at 186, such as when a city attempts to give the circuit courts appellate jurisdiction over municipal court or city commission decisions. *See, e.g.*, *La Grande v. Municipal Court et al.*, 120 Or 109, 251 P 308 (1926) (holding that the city could not designate the circuit courts as the appellate court for the local municipal court without state authorization); *Lines v. City of Milwaukie*, 15 Or App 280, 515 P2d 938 (1973), *reh'g den* (1973), *rev den* (1974) (holding that a city lacked authority to designate the circuit courts as the appellate court for the city civil service commission). The Court of Appeals in *Sims* distinguished those cases, noting that "in contrast, the Portland ordinance does not purport to confer any jurisdiction on state courts or to assign any function to them," but "provides only that people harmed by violations of it shall have a cause of action in any court of competent jurisdiction." 165 Or App at 186 (internal quotation marks omitted). The Court of Appeals concluded that "Oregon municipal law is also a source of law that an Oregon circuit court can apply in adjudicating a private dispute," and that "it is within the judicial power of the circuit court to adjudicate a private dispute that arises under Oregon municipal law." *Id.* at 189.

*Sims* is consistent with this court's decision in *Covey Garage v. Portland*, 157 Or 117, 70 P2d 566 (1937). In *Covey Garage*, this court considered a Portland ordinance providing that any person injured by "the carelessness, negligent [*sic*] or unlawful act" of *the driver* of a rental car was "authorized to institute an action" against the *licensee* of that rental car (or their surety or insurer). 157 Or at 120-21 (internal quotation marks omitted). In doing so, it purported to create a cause of action that was not previously available

in tort or otherwise. In challenging that ordinance, a rental car company argued that the ordinance was preempted by state law in the field of vehicle regulation. This court held that, under its home-rule authority, the city had the "power to adopt the ordinance" so long as "it conflicts with neither a constitutional provision nor with a statute, and if it constitutes a proper exercise of the city's police power." *Id.* at 123. The cause of action created by the ordinance was therefore enforceable in state court and not *ultra vires*.

*Sims* and *Covey Garage* are also consistent with *Portland v. Western Union Tel. Co.*, 75 Or 37, 146 P 148 (1915). In that case, this court considered a Portland ordinance requiring messenger businesses to post a bond for the faithful delivery of goods and packages, and further granting any person aggrieved by a failed delivery "a right of action upon the bond in the name of the city." *Id.* at 39. Although an action in tort by a customer against a messenger company would likely have been available at common law, an action upon the bond in the city's name would not have been, and the ordinance therefore created a cause of action. This court upheld that ordinance as "consonant with the powers and purposes of the city of Portland, consistent with the laws and policy of the state, and *** a proper exercise of the police power enacted for the purpose of regulating and not restraining occupations." *Id.* at 43. Based on those cases, *Sims* was correctly decided, and home-rule municipalities in Oregon are not generally barred from creating causes of action in areas within their regulatory authority.

As the city points out, plaintiffs identify no statute or rule of law that affirmatively divests the circuit courts of jurisdiction over claims arising under municipal law. The city correctly argues that the legislature knows how to divest circuit courts of jurisdiction when it so chooses. *See, e.g.*, ORS 197.825(1) (divesting circuit courts of jurisdiction to review local land use cases); ORS 109.741 (divesting circuit courts of jurisdiction over certain child-custody matters). The legislature did not do so in ORS 91.225 or in any other statute cited by plaintiffs.

With no affirmative divestment of jurisdiction to cite, plaintiffs argue that the ordinance at issue here is

invalid because it has no express state law authorization. We reject that argument. Under the home-rule provisions of the Oregon Constitution, municipalities do not require the acquiescence of the state to legislate within their own jurisdiction. *See City of Portland v. Jackson*, 316 Or 143, 149, 850 P2d 1093 (1993) ("The people of Oregon, by amending Article XI, section 2, gave to the people of a municipality (acting through their local government) the right to pass laws, and restrict their own individual freedom and the freedom of others within their jurisdiction, subject only to the 'Constitution and the criminal laws of the State of Oregon.'"). The private cause of action established in the ordinance to seek redress for violations of the ordinance is permissible, and the circuit court has jurisdiction over such actions.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings.

**GARRETT, J.,** dissenting.

ORS 91.225 prohibits cities and counties from enacting any ordinance that "controls the rent." From the statutory text, legislative history, and surrounding context, it is clear that the legislature's concern was that local governments, faced with rising rents due to inadequate housing supply, would try to address that problem—and thereby exacerbate it—by interfering with the setting of fair market rates for rent.

The City of Portland, having declared a "Housing State of Emergency," enacted Ordinance 188219 ("ordinance"), which provides that, if a landlord raises the rent by 10 percent or more in a 12-month period and the tenant subsequently gives notice of an intent to terminate the lease, then the landlord must make a cash payment to the tenant in an amount ranging from $2,900 to $4,500, depending on the size of the unit. Portland City Code 30.01.085 (2017), *amended by* Ordinances 188519, 188558, 188628 (2017), 188849 (2018), 189421, 189726 (2019). Although the ordinance does not create "rent control" in the typical form, it nevertheless imposes an adverse financial consequence

on a landlord for no reason other than its decision to raise the rent. Because I believe that effort to restrain rent falls within the scope of what the legislature prohibited in ORS 91.225, I respectfully dissent.

I begin with the relevant text of ORS 91.225:

"(1)   The Legislative Assembly finds that there is a social and economic need to insure an adequate supply of affordable housing for Oregonians. The Legislative Assembly also finds that the imposition of general restrictions on housing rents will disrupt an orderly housing market, increase deferred maintenance of existing housing stock, lead to abandonment of existing rental units and create a property tax shift from rental-owned to owner-occupied housing. Therefore, the Legislative Assembly declares that the imposition of rent control on housing in the State of Oregon is a matter of statewide concern.

"(2)   Except as provided in subsections (3) to (5) of this section, a city or county shall not enact any ordinance or resolution which controls the rent that may be charged for the rental of any dwelling unit."

The question is what is meant by the phrase "controls the rent" in subsection (2). I agree with the majority's textual analysis of that phrase: ORS 91.225 preempts "local laws that 'regulate' or 'exercise *restraining* or *directing* influence over' the rent that landlords may charge." 368 Or at 670 (emphases in majority).

I also agree with the majority that that definition is not enough to resolve this case. One could interpret "regulate" and "exercise restraining or directing influence over" narrowly to mean that the only type of prohibited ordinance is one that directly prescribes the amount of rent that may be charged. Alternatively, one could understand those terms more broadly to encompass ordinances that have any restraining, limiting, or directing influence on rent. I agree with the majority that the most expansive understanding of those terms is not what the legislature had in mind. *Id*. The word "control" connotes purposive action; thus, the statute is naturally read to prohibit local measures that are *aimed* at restraining, limiting, or directing rent (and are calculated to have that

effect[1]), and not to prohibit all local measures that could have an effect, however indirect, on landlords' costs or on the rental market generally.

That understanding follows from the legislative history, which reflects a concern that local governments, faced with a problem of high rents, would be tempted to simply restrain them instead of taking longer-term actions geared toward increasing the supply of affordable housing. The legislative record is replete with testimony to the effect that the promised benefits of suppressing rent below fair market levels are, at best, transient and that "rent control, in the long run, makes affordable housing less available for lower-income renters." Testimony, House Committee on Judiciary, HB 2505, Apr 16, 1985, Ex E (testimony of Debbie Wood, State Housing Council). That is because actions taken by government to keep rent below fair market rates reduce the "incentive for developers to develop and maintain rental units." *Id.* As the potential profitability of housing development is artificially suppressed, investors will opt out and spend their money where it is not so suppressed, compounding the very problem of short supply that led to rising rents in the first place. As another witness put it,

> "[a]lthough the imposition of rent controls has in most cases been in response to a 'housing shortage' and the subsequent spiral of rising rents, the experience of cities in which rent control has existed for a period of time strongly supports the conclusion that rent control not only does not alleviate the problem, it actually leads to greater pressures on the rental housing market and has a severe economic impact in the communities in which it is imposed."

Testimony, House Committee on Judiciary, HB 2505, Apr 30, 1985, Ex K (testimony of James Irvine, Oregon State Home

---

[1] The majority misinterprets what I mean by saying that "control" connotes purposive action. 368 Or at 670 n 5. I do not contend that ORS 91.225 preempts any ordinance that might have been enacted for the subjective purpose of trying to control rent, regardless of what the ordinance actually does. To be preempted, an ordinance must satisfy two conditions: It must be directly targeted at restraining the amount of rent that a landlord charges, *and* it must be calculated to have that effect. To put it differently, another case might present the question whether a city that deliberately tried to control fair market rents through a completely ineffectual means (such as the imposition of a one-dollar fine on landlords) could be saved from preemption by its own ineptitude. This is not that case.

Builders Association and The Multifamily Housing Council of Oregon).

In response to those concerns, the legislature prohibited cities and counties from enacting "any ordinance or resolution which controls the rent that may be charged for the rental of any dwelling unit." ORS 91.225(2). As noted above, I agree with the majority that "controls," in this context, encompasses ordinances that regulate or exercise restraining or directing influence over the amount of rent that a landlord may permissibly charge. The crucial question, however, remains whether ORS 91.225 prohibits *only* the direct prescription of rent, or whether city ordinances may violate the statute through less direct means.

The majority opinion is elusive on that point. On the one hand, it seems to conclude from the text, context, and legislative history that preemption applies only to ordinances that "prescribe certain rent amounts or prohibit increases." 368 Or at 678. On the other hand, the majority proceeds to consider whether a city could violate ORS 91.225 through an ordinance that "effectively" does the same thing—and it seems to answer that question "maybe, but not in this case." 368 Or at 681-82.

There should be no doubt that a city can violate ORS 91.225 through means other than "prescrib[ing] certain rent amounts or prohibit[ing] increases." 368 Or at 678. Those types of prescriptions and prohibitions are commonly known as "rent control." If the legislature had prohibited "rent control," perhaps it would be reasonable to infer that the legislature was concerned only with what most people think of when they hear that phase, *i.e.*, the model exemplified in New York and San Francisco, where rents are set by city regulators. But the legislature did not do that; it prohibited ordinances that "control[] the rent." ORS 91.225(2). That choice of language is significant because the phrase "rent control" appears in the previous subsection of the statute, where the legislature stated its prefatory findings. ORS 91.225(1). Having specifically called out the concern about "rent control" in subsection (1), the legislature could easily have repeated that phrase in subsection (2), the operative provision of the statute, which states what cities and

counties are prohibited from doing. That is, if the legislature had been content to prohibit cities and counties from setting up rent-regulation boards, it could have done that. But legislators, being students of human nature, knew that prohibiting a single means to an undesired end can be a roadmap for evasion. Instead, they chose to prohibit any ordinance that "controls the rent." ORS 91.225(2). That choice alone signals that the legislature did not want the preemption inquiry to turn on whether cities had chosen a specific *mechanism*. That signal is amplified by the warning in subsection (1) about "the imposition of general restrictions on housing rents." ORS 91.225(1).

However, *even if* the phrase "controls the rent" should be understood to mean exactly the same thing as "rent control," that still does not mean that the only way that a city can violate the statute is by fixing rents at certain levels. Given its stated purpose, the prohibition should be understood to cover local ordinances that "regulate" or "exercise restraining or directing influence over" the amount of rent—either by direct prescription or prohibition, or through less direct measures that are nonetheless calculated to "regulate" or "exercise restraining or directing influence over" the rent by directly attaching adverse consequences to the setting of rents at levels that the city does not favor. Consider two hypothetical ordinances:

(1)  "No landlord shall raise rent by more than 10 percent in a 12-month period."

(2)  "Landlords may set rents at whatever levels they choose, but those who raise rent by more than 10 percent in a 12-month period shall pay a fee to the city in the amount of $25,000 per affected unit."

The difference between those two ordinances is no difference at all when it comes to real-world consequences. The legislature cannot have intended to treat them differently. The majority somehow resists that conclusion; it only begrudgingly considers the possibility that ORS 91.225 preempts ordinances that "effectively" control the rent even without a direct prescription or prohibition. 368 Or at 681. Then, "assuming without deciding" that the answer is yes, the majority goes on to conclude that Portland's ordinance

does not do so, essentially because the financial consequences that the city has chosen to impose are not sufficiently harsh to deter landlords from setting rents at their desired levels. 368 Or at 681-82. The majority is incorrect.

In the majority's hypothetical example, if the market would support an increase of 10 percent in the rent for a studio apartment, a landlord who raises the rent by exactly 10 percent for one year, and then increases that rent 9.9 percent the following year, would recoup the $2,900 "relocation assistance" payment and earn an additional $1,533 over those two years. From that, the majority infers that the $2,900 payment is not enough to interfere with the setting of market rent. The flaw in the majority's reasoning is that no rational landlord would do what the majority proposes. Instead of raising the rent 10 percent in the first year, the landlord would raise the rent by 9.9 percent in both years, earning nearly the same amount of increased rental revenue and avoiding the $2,900 "relocation assistance" payment altogether. The difference between 9.9 percent and 10 percent may seem trivial, but economically it will make sense for many landlords to raise rent no more than 9.9 percent even where the market would support increases of 11 percent, 12 percent, or more. Moreover, because of the compounding effect, the difference between annual increases of 9.9 and, say, 12 percent will lead to highly disparate results over time. The majority dismisses all of this as simply "altering a landlord's calculus regarding how much it will increase the rent," but that is the entire point. 368 Or at 682. A landlord that must alter its rent-raising calculus solely to avoid a city-imposed financial penalty[2] has had its freedom to set rents "restrained" just as if the city had enacted an outright prohibition.

The majority's argument also fails to take the city at its word. The city made no bones about its intent to discourage landlords from raising rents in amounts higher

_____

[2] The majority makes much of the difference between a "penalty," as plaintiffs call it, and a "relocation assistance payment," as the city calls it. 368 Or at 679-80. The terminology is irrelevant, as is the use to which the money is put. What matters is the indisputable fact that the city has imposed a *cost* on landlords that is tied directly to their decision to raise rent and thus restrains their freedom to do so.

than what the city considered acceptable. At the February 2, 2017, Portland City Council meeting discussing the ordinance, Commissioner Eudaly, the lead sponsor, framed it as a deterrent when she said, "there's an easy way to avoid relocation assistance. Do not no-cause evict your tenants and don't raise their rent 10 percent or more per year." Audio Recording, Portland City Council, Ordinance 188219, Feb 2, 2017, Part 21 of 27, at 11:40 (comments of Commissioner Chloe Eudaly), https://www.portlandoregon.gov/auditor/article/622981 (accessed Oct 29, 2021). The deterrent purpose and effect of the ordinance was further confirmed when, three years later, the city's mayor described the relocation assistance program as "one tool we have to keep rent levels stable." Audio Recording, Portland City Council, Ordinance 190122, Sept 16, 2020, Part 1 of 3, at 2:43:13 (comments of Mayor Ted Wheeler supporting an amendment to lower the 10 percent threshold for relocation assistance payments during the COVID-19 public emergency), https://www.portlandoregon.gov/auditor/article/751848 (accessed Oct 29, 2021). Even putting those comments aside, the purpose of discouraging rent increases is amply demonstrated by the fact that, if the city had been concerned solely with providing assistance to displaced renters, other means were available. The city could have required payments to all renters who terminate their leases without regard to the amount of any rent increase, or whether it had been increased at all. Or the city could have imposed a surcharge on all leases to fund an assistance program for displaced renters. Instead, the city required the "relocation assistance" payment only from landlords who raised the rent more than a threshold amount. This court should assume the city knew what it was doing, and I see no reason for this court to question the city's economic assumptions about what would work. Certainly, there is nothing in the record that gives this court a basis for confidently stating that the penalties the city chose to impose are too modest to make a difference.

In my view, the text of the ordinance and the circumstances surrounding its adoption permit only one conclusion: The city, as a means of "stabilizing" rising rents, intended to deter landlords from setting rents at fair market levels and selected a coercive tool to accomplish that

objective. That is what the 1985 Legislative Assembly feared cities would do. The ordinance is a measure that "controls the rent" and is preempted by ORS 91.225(2). Because the majority concludes otherwise, I respectfully dissent.